[No. A028702. First Dist., Div. Five. Dec. 10, 1985.]

ROSE K. KAMINSKI, as Executrix, etc., et al., Plaintiffs and Respondents, v.
WESTERN MᴀᴄARTHUR COMPANY, Defendant and Appellant.

[No. A029762. First Dist., Div. Five. Dec. 10, 1985.]

JOHN CRETAN, Plaintiff and Respondent, v.
FIBREBOARD CORPORATION, Defendant and Respondent;
WESTERN MᴀᴄARTHUR COMPANY, Defendant and Appellant.

[No. A030047. First Dist., Div. Five. Dec. 10, 1985.]

WESTERN MᴀᴄARTHUR COMPANY, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
In re SHIPYARD AND APPLICATOR ASBESTOS CASES
(KAZAN & KILBOURNE) et al., Real Parties in Interest.

[No. A030125. First Dist., Div. Five. Dec. 10, 1985.]

WESTERN MᴀᴄARTHUR COMPANY, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
In re STERNS, BROWN & FINNEY et al.,
CONSOLIDATED FOR DISCOVERY, RELATED SHIPYARD AND
APPLICATOR ASBESTOS CASES, Real Parties in Interest.

[No. A031922. First Dist., Div. Five. Dec. 10, 1985.]

WESTERN MᴀᴄARTHUR COMPANY, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
In re RELATED ASBESTOS CASES CONSOLIDATED FOR
GENERAL PRETRIAL MATTERS (KNAPP) et al.,
Real Parties in Interest.

448

---

COUNSEL

Eugene Brown, Jr., Mary Ellen Gambino, Raymond J. Bergez, Bruce E. Loper and Hardin, Cook, Loper, Engel & Bergez for Defendant and Appellant and Petitioner.

Harry F. Wartnick, Cartwright, Sucherman & Slobodin, Daniel U. Smith, David M. McClain, Steven Kazan, George W. Kilbourne, Bryce C. Anderson, Madelyn J. Chaber, Brown & Finney, Sterns, Smith & Walker and Kenneth L. Knapp for Plaintiffs and Respondents and for Real Parties in Interest.

No appearance for Respondent and Defendant and Respondent.

## OPINION

**LOW, P. J.**—In these consolidated cases, we hold that Western MacArthur Company, a Bay Area distributor of Johns-Manville asbestos products, is the corporate successor of the now-defunct Western Asbestos Company for purposes of product liability for personal injuries arising from asbestos exposure. In *Kaminski* v. *Western MacArthur Company* (A028702), Western MacArthur Company appeals from a judgment entered on a jury verdict awarding damages for personal injuries and loss of consortium, after a court trial on the issue of successorship resulted in a finding of successor liability. In the three writ proceedings, *Western MacArthur Company* v. *Superior Court (In re Shipyard and Applicator Asbestos Cases (Kazan & Kilbourne))* (A030047); and *Western MacArthur Company* v. *Superior Court (In re Sterns, Brown & Finney, Consolidated for Discovery, Related Shipyard and Applicator Asbestos Cases)* (A030125); and *Western MacArthur Company* v. *Superior Court (In re Related Asbestos Cases Consolidated for Pretrial Matters (Knapp))* (A031922), Western MacArthur Company challenges orders of the Superior Court of Alameda County which grant summary judgment on the successorship issue to numerous asbestos plaintiffs, whose suits have been consolidated for discovery and other pretrial matters.[1] In *Cretan* v. *Fibreboard Corp. et al.,* Western MacArthur Company appeals from a stipulated judgment, having reserved the right to seek appellate review of the summary adjudication orders at issue in the writ proceedings. We consolidated the proceedings.[2] In *Kaminski,* Western MacArthur Company challenges the successorship determination and raises several other issues. In the writ proceedings, the company argues that triable issues of material

---

[1] Each writ proceeding involves a group of asbestos plaintiffs represented by the same law firm. The cases were consolidated on that basis and under the designation of the firm name. The plaintiffs appear as real parties in interest in the writ proceedings under these collective designations.

[2] All cases except A031922 were consolidated May 8, 1985. A031922 was inadvertently assigned to another division of this court, and was transferred to this division on October 17, 1985. We hereby order A031922 consolidated with the other cases.

fact remain on the successorship contention, and that the granting of summary judgment was error.[3] Because the successorship issue has already been presented to a trier of fact in *Kaminski,* we first review that proceeding.

## I

Jack and Rose Kaminski sued several asbestos manufacturers and distributors, including Johns-Manville and Western MacArthur Company, for personal injuries and loss of consortium caused by asbestos exposure. Jack Kaminski suffered from mesothelioma, a fatal illness caused by inhaling asbestos dust or fibers. The Kaminskis settled with all codefendants except Western MacArthur Company. The preliminary issue of successor liability of Western MacArthur Company for the product liability of its predecessor was separately tried to the court, which found the company liable under *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3]. The issues of products liability and damages were then tried to a jury, which found the asbestos to be a defective product. The jury awarded $400,000 for Jack Kaminski's personal injuries and $100,000 for Rose Kaminski's loss of consortium. The amount of the judgment was reduced by the amounts received in settlement from the codefendants.

## A

Jack Kaminski was exposed to asbestos during 1942, when at the age of 21 he was employed at the Bethlehem Shipyard in San Francisco as a shipfitter's helper. From May to June of 1942, he worked at Moore Drydock in Alameda, then returned to Bethlehem during the summer months, and in the fall of 1942 resigned to enlist in the Army Air Force.

While employed at Bethlehem, Kaminski helped welders install aluminum angle bars in the ammunition compartments of 1,650-ton destroyers. Kaminski's job was to hold the bars in place with an asbestos cloth, or blanket, while the bars were welded to the bulkhead. Kaminski would also drape himself with the cloth to ward off sparks and occasionally tore the cloth, which released asbestos dust. In the confined and unventilated ammunition compartment, the air was constantly dusty and the asbestos dust permeated Kaminski's hair, clothing and tools. Kaminski also worked around others installing asbestos insulation. Kaminski was also exposed to asbestos insulation in the two months he worked at Moore Drydock.

Jack Kaminski was unaware of any health hazard posed by exposure to asbestos or the breathing of asbestos dust. No warnings were placed on the asbestos products, and no one informed Kaminski of any danger.

---

[3]*Cretan* has been submitted by appellant on the writ petitions.

In 1982, 40 years after his exposure to asbestos, Jack Kaminski was diagnosed as having malignant mesothelioma. Malignant mesothelioma is untreatable, painful, and invariably fatal. The only treatment is palliative, to ease the effect of the pain and other symptoms and extend life to a certain degree.[4]

There is substantial evidence that Jack Kaminski's mesothelioma was caused by exposure to asbestos. Kaminski's testimony established that the only such exposure occurred during his wartime work at Bethlehem Shipyard and Moore Drydock. Western Asbestos Company supplied all or virtually all the asbestos products used at Bethlehem Shipyard, including asbestos cloth and pipe insulation. It also performed much of the insulation work on destroyers built at Bethlehem Shipyard. It was conceded that Western Asbestos did not supply asbestos products to Moore Drydock.

### B

The Western Asbestos Company (hereafter usually Western) was formed in the early 1900's, and became a Bay Area distributor of Johns-Manville asbestos products in 1930 or 1932. The company established a reputation as a reliable business. By 1965, it was suffering financial setbacks and was in urgent need of operating capital. Rather than dissolve the corporation and lose everything, the corporation's three stockholder-directors (Purcell, Wayland and Kelly) contacted J. G. Ordway of the MacArthur Company of St. Paul, Minnesota (hereafter MacArthur), with an offer to sell Western to MacArthur. MacArthur distributed building materials, owned a subsidiary which distributed Johns-Manville asbestos products, and had maintained a relationship with the Johns-Manville Company dating back to the early 1900's. MacArthur eventually became the parent corporation to Western MacArthur Company (hereafter Western MacArthur).

On August 20, 1965, MacArthur's agents and Western's directors executed a "Memorandum of Agreement" which gave MacArthur complete operational control of Western. MacArthur agreed to take over and assume the active management and control of all business operations; the agreement twice more used the phrase "take-over" to describe the transfer of managerial control. A MacArthur employee, Philip A. Taylor, was designated executive vice-president and full-time general manager of Western.

MacArthur's managerial control was described as "without limitation," and included authority to supervise the purchase of materials and handling of inventory; the hiring, firing and fixing of wages of Western employees;

---

[4]Jack Kaminski died during the pendency of this appeal.

management of sales activities and contract operations; purchase or leasing of real and personal property on behalf of Western; and the right to obtain financing and incur indebtedness in Western's name. Western's original three directors stayed on but had no role in the management of the business, and received nominal salaries. They were obligated by the agreement to approve and properly implement all recommendations by MacArthur pertinent to the management of the company. Both J. G. Ordway, MacArthur's president, and Philip Taylor were made directors of Western.

MacArthur was to receive as fee 50 percent of Western's net profits. MacArthur agreed to loan Western a total of $300,000 for operating capital; existing loans to the corporation by its original directors and members of their families were subordinated to the MacArthur obligations. The agreement also required Western to place its ownership stock in escrow, and gave MacArthur the option to purchase the stock at the price of $300,000. Philip Taylor stated that MacArthur's intention was to eventually purchase Western if it began to make a profit.

On August 27, 1965, Purcell, Wayland and Kelly circulated a memo to all Western employees, informing them of the management changeover and indicating that "[i]t is anticipated that ultimately MacArthur Co. will purchase Western Asbestos Co." A similar letter was sent to the company's suppliers. Taylor wrote to Western customers informing them of the management change, stressing that the three original directors would be retained as inactive officers and directors "because of their vast knowledge in the fields covered by Western Asbestos"; the letter expressed the new management's intent to "carry on the administration responsibilities of this well-established, highly regarded firm," to provide "even greater service to our customers."

By April 1966, Western was indebted to MacArthur in the amount of $300,000. The indebtedness had priority to the director/stockholder loans of Wayland, Purcell and Kelly.

On March 29, 1967, Western's board of directors held a special meeting attended by Ordway, Taylor, and the three original directors. Ordway announced that because of a recent credit curtailment, further business operations were "impossible"; Ordway suggested that dissolution would be in the best interests of all parties involved. MacArthur would form a new corporation, Western MacArthur Company, to distribute asbestos products in the Bay Area. Ordway proposed that MacArthur be relieved of its management contract in exchange for waiver of MacArthur's rights to subordinate the loans of the original directors. The board agreed and voted to cease business operations at the end of April. The board expressed no ob-

jection to the formation of a new company to engage in asbestos distribution; accepted the resignation of Ordway and Taylor as members of the board; and appointed a representative to a liquidation committee to dispose of Western's assets.

Western's indebtedness to MacArthur was confirmed at $300,000. MacArthur was given the right to purchase at least $200,000 worth of Johns-Manville products in Western's inventory, and at least $100,000 of other noncash assets. MacArthur agreed to take over all of Western's outstanding contracts. Western sold its goodwill and customer mailing lists and records to MacArthur for "a nominal amount to be agreed on later." MacArthur agreed to assume all of Western's current contracts, including work in progress.

Upon formation, Western MacArthur assumed Western's contracts as of May 28, 1967; 45 of Western's 50 employees stayed on as employees of Western MacArthur. Ordway and Taylor were installed as board members; Taylor was appointed vice-president. Western MacArthur used Western's customer lists in conducting its new business. Western MacArthur sent a letter to Western customers asking if it may "continue to serve" them, stressing that the new company had "the same experienced personnel" and offered "the same products, engineering and contracting services."

Western MacArthur continued to supply the same products and services as Western. It employed the same sales personnel, warehousemen, truck drivers, and estimators. Johns-Manville remained the primary supplier, and the product line and shipyard work remained essentially unchanged. Orders addressed to "Western Asbestos" were filled by Western MacArthur. Western MacArthur capitalized on Western's reputation. Prior to the formation of Western MacArthur, people referred to "Western Asbestos" as "Western"; the verbal shortform continued to be used in reference to "Western MacArthur."

MacArthur never exercised its option to purchase Western's ownership stock. At no time did Western MacArthur Company formally hold itself out to be the same corporate entity as Western Asbestos Company. Western formally dissolved in 1969.

## II

### A

In *Ray* v. *Alad Corp.*, *supra,* 19 Cal.3d 22, the court announced an exception to traditional corporate law doctrines of liability of successor cor-

porations, to maximize recovery of products liability plaintiffs consistent with the significant policies underlying products liability. The court established a three-prong test for application of successor liability: "Justification for imposing strict liability upon a *successor* to a manufacturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (*Id.*, at p. 31.)

The Alad Corporation manufactured ladders. The business was acquired by a second corporation, Alad II, through an asset purchase. Alad II continued the same manufacturing operation under the name "Alad Corporation," using the same equipment, designs and personnel, soliciting Alad I's customers with the same sales representatives, and showing no outward indication of a change in ownership. Plaintiff was injured in a fall from a defective ladder manufactured by Alad I before the transfer of the business. Plaintiff sued Alad II for products liability.

Applying the three-pronged test to the facts before it, the Supreme Court first concluded that Ray's remedies against the ladder's original manufacturer had been virtually destroyed by the corporate takeover. Ray's claim was not in existence at the time of Alad I's dissolution, and was not included in claims paid during liquidation. Ray was thus left with only the "formidable and possibly insuperable obstacles" of attempting to satisfy a judgment against former stockholders and directors. Because of such barriers to suit against the predecessor corporation, the Supreme Court concluded that successor liability was necessary to prevent a "complete denial of redress" against the manufacturer of a defective product.

Second, Alad II had the same ability to spread the risk of defective products as did Alad I. The successor continued to manufacture the same product line with the same plant and equipment, and with the same know-how and experienced personnel of the former manufacturer. Under these circumstances, Alad II had the same ability to estimate the risks and meet them by obtaining insurance, as well as the ability to spread among its customers the cost of compensating plaintiffs.

Third, it was fair and equitable to impose upon Alad II successor liability, because of its marketing of the same product under the same name with the use of its predecessor's goodwill.

**B**

The trial court imposed successor liability under the principles espoused in *Ray*, emphasizing that MacArthur enjoyed total control over Western during the life of the management agreement, then essentially continued through its offspring, Western MacArthur, in Western's former role of primary Bay Area distributor for Johns-Manville. The trial court found that when MacArthur first entered the Bay Area asbestos market on August 20, 1965, it had no local track record, reputation, goodwill or corporate presence. MacArthur's management had no background or experience in the maritime insulation business, the refinery insulation business, or the insulation services provided to Pacific Gas and Electric Company; the court found that MacArthur acquired the necessary experience and knowledge in these specialized areas from employees of Western and the experience of managing the company, and carried them forward into the new Western MacArthur Company. The court made similar findings regarding MacArthur's knowledge of the ins and outs of the Bay Area asbestos market, and the knowledge of how local competitors operated. The court further found that Western MacArthur acquired "considerable" inventory, furniture, equipment and other assets of Western; kept its ongoing contracts and virtually all of its workforce; and used its customer lists to actively solicit Western customers. The court referred to the "continue to serve" letter by which Western MacArthur told the customers it had the same experienced personnel and quality goods and services of its predecessor. By the use of "Western" to denote both businesses, the trial court stated that "the very name of the [new] business . . . evidences an intent by that company to benefit from Western Asbestos Company's good name and good will."

The trial court concluded that "the business being conducted by Western MacArthur when it opened its doors in June, 1967, was virtually the same as the business which Western Asbestos had been conducting through May, 1967," and that "under the facts of this case Western MacArthur should bear the burden for defective products sold or distributed by Western Asbestos."

**C**

Western MacArthur argues initially that *Ray* cannot support a finding of successor liability because its rule applies only to manufacturers, not distributors of defective products.

■ In products liability cases, a consumer injured by a defective product may sue any business entity in the chain of production and marketing, from the original manufacturer down through the distributor and wholesaler to

the retailer; liability of all such defendants is joint and several. (*Becker* v. *IRM Corporation* (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116]; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]; *Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 [71 Cal.Rptr. 306] [strict liability applied to wholesale-retail distributor].) As reaffirmed by our Supreme Court in *Becker*, the purpose for this "stream of commerce" approach to strict liability is to extend liability to all those engaged in the overall producing and marketing enterprise who should bear the social cost of the marketing of defective products. (*Id.*, at p. 459.) By extending liability to entities farther down the commercial stream than the manufacturer, the policy of compensating the injured plaintiff is preserved, and retailers and distributors remain free to seek indemnity against the manufacturer of the defective product.

■ Given the policies underlying strict liability, the "stream of commerce" approach to liability should extend to successor entities. When a distributor or retailer acquires a corporation and takes advantage of its goodwill and other corporate assets and facilities to inject the predecessor's product line into the stream of commerce, it continues "the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." (*Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d at p. 262.) To hold *Ray* inapplicable to successor distributors and retailers would be contrary to the policy of compensating injured plaintiffs from the resources of those better capable of estimating and spreading the risk of the marketing of defective products.

Nothing in *Ray* conceptually limits its reasoning to manufacturers. A distributor in the stream of commerce is a potential defendant for injured products liability plaintiffs; should a corporation succeed that distributor under the criteria set forth in *Ray*, the succession effectively removes the predecessor from the plaintiffs' pool of recovery. Just as the successor manufacturer cuts off the plaintiffs' remedies against its predecessor, so may a distributor.

Western MacArthur argues, however, that as a distributor it did not enjoy the manufacturer's prerogative of raising prices to spread the cost of compensation as a cost of doing business. Western MacArthur fails to cite any portion of the record which would support its factual claims that it had no leeway over prices or any other ability to adjust its prices to assume the spreading of risk. Moreover, its argument, although of facial appeal, is inconsistent with the general application of liability to distributors. The solution to the distributor's fixed-cost dilemma is to seek indemnity against the responsible manufacturer, not to avoid successor liability vis-à-vis the injured plaintiff. Western MacArthur also has the superior ability to estimate

the risk of marketing defective products and provide for appropriate insurance. (*Ray* v. *Alad, supra,* 19 Cal.3d at p. 33.) The distributor is in a better position than the plaintiff to insure against the risks. It is also in a better position to engage in negotiations with the manufacturer to share the costs of such risks, and to minimize the risk of injury by taking appropriate measures, such as warning labels, or to engage in a detailed study of the hazards of a familiar product.

■ *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890 [159 Cal.Rptr. 119] (petn. for hg. den. Dec. 13, 1979), stressed the policy of maximizing recovery of products liability plaintiffs, and expressed the view that "*Alad* should not be construed so narrowly as to create an exclusive exception to the general rule for successor liability permitting a similar result only in an *Alad* clone. It is essential to focus on the policy considerations underlying strict products liability rather than merely counting the factors mentioned in *Alad* and giving each equal weight. The constant theme of strict tort liability has been 'to elevate justice and equity above the exact contours of a mathematical equation. . . .'" (*Id.,* at p. 900, quoting *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 742 [144 Cal.Rptr. 380, 575 P.2d 1162].)

■ Western MacArthur contends that even if *Ray* applies to corporate distributors, its rule applies only when a successor purchases the "principal assets" of a "going concern." The company contends it neither purchased the "principal assets" of Western, nor acquired a "going concern." Western MacArthur suggests it merely purchased "some" inventory and equipment, and "a few" vehicles. The trial court found, however, that Western MacArthur, through its parent MacArthur, had acquired "considerable" assets of Western, including customer records, goodwill and equipment, office furniture and what the record indicates was hundreds of thousands of dollars worth of inventory. Western MacArthur implies that the assets and inventory were insignificant; we disagree in light of the trial court's finding, which Western MacArthur has not shown to be erroneous or unsupported.

■ We likewise find no merit to Western MacArthur's contention that there should be no successor liability because Western may not have been a "going concern." Although suffering from capital shortages, the company retained its experienced personnel, customer lists, reputation and goodwill, all of which Western MacArthur used to continue distribution of asbestos products in the Bay Area market. *Ray* emphasizes that one who obtains the benefit of a corporation's goodwill and business history should bear the burden of its product liability suits, if the successor continues in the marketing enterprise. (*Ray* v. *Alad, supra,* 19 Cal.3d at p. 34.)

■ Western MacArthur further asserts that it did not "cause" the dissolution of Western, but that the company dissolved pursuant to a voluntary decision of its three original directors. Thus, Western MacArthur argues it did not "cause" destruction of plaintiffs' remedies against the original business. Cases adopting or interpreting *Ray* do not impose such a strict interpretation of the causation requirement. The Supreme Court of Washington, following *Ray* v. *Alad*, has ruled that there need be only a "causal connection" between the successor's acquisition and the unavailability of the predecessor as a potential defendant for the injured plaintiff. The successor need only have "played some role in curtailing or destroying the [plaintiff's] remedies." (*Hall* v. *Armstrong Cork, Inc.* (1984) 103 Wn.2d 258, 265-266 [692 P.2d 787, 791-792]; accord *In re Related Asbestos Cases* (N.D.Cal. 1983) 578 F.Supp. 91, 92-94, affd. *sub nom.*, *Kline* v. *Johns-Manville* (9th Cir. 1984) 745 F.2d 1217 [successor's acquisition need only "contribute" to the destruction of plaintiff's remedies].) Successor liability has generally been denied for a lack of causation in situations showing no contributory cause in the predecessor's demise, such as when the predecessor sells product line assets but dissolves at a later date and for an independent reason. (See, e.g., *Hall* v. *Armstrong Cork, Inc.*, *supra*, at pp. 790-791; *Reed* v. *Armstrong Cork Co.* (E.D.Ark. 1983) 577 F.Supp. 246.)

MacArthur exercised complete control of Western, which became indebted to MacArthur for the exact value of its escrowed stock. With its right to subordinate the loans of other creditors, MacArthur could have at any time forced Western into bankruptcy. It also had the right to essentially dictate policy to the original Western directors, who were forced to implement all decisions including the decision to dissolve. With the twin levers of financial and managerial control, MacArthur engineered a takeover whereby its corporate progeny, Western MacArthur, succeeded to the operations, goodwill, customer lists, and a name similar to "Western Asbestos." The essence of the takeover resulted in the transfer of assets and goodwill sufficient to enable Western MacArthur to capitalize on its predecessor's industry and reputation and continue distribution of Johns-Manville asbestos products. We may readily conclude that the transaction was an acquisition of principal assets which caused or at least substantially contributed to the absence of Western from the recovery pool of product liability plaintiffs, and the destruction of Jack and Rose Kaminski's remedies against it.

Western MacArthur insists, however, that had it *not* taken over, Western would have gone into bankruptcy and the Kaminskis would be no worse off now if successor liability were denied. It may be true that had Western MacArthur not acquired the corporation, it would have failed; the fact is it did step in, take the assets and goodwill of Western and cause it to dissolve.

Western MacArthur used Western's resources to continue the product line, and in the process extinguished the Kaminskis' remedies against Western.

Western MacArthur further contends that the Kaminskis actually do continue to have a remedy against the original stockholders of the corporation, although not the corporation itself. The company then asserts that the plaintiffs made no showing at trial that they pursued this remedy by locating the directors and serving them with process.  ■  Plaintiffs may have a technical right to proceed against the directors of a dissolved corporation; as *Ray* noted, that right encounters "formidable and possibly insuperable obstacles." The *Ray* court concluded that this technical right was virtually meaningless to the injured plaintiffs, and dismissed it as a factor which could cause "complete denial of redress for a legitimate claim" if successor liability was not available in the appropriate case.

■  Finally, we reject Western MacArthur's contention that because of *Ray*'s use of the phrase "complete denial of redress," successor liability is only appropriate where the injured plaintiff has no other remedy or recovery against any other defendant. Products liability defendants in the chain of commerce suffer joint and several liability. Western MacArthur has pointed to no principle of law, nor do we know of any, which prevents recovery against one product liability defendant because of settlement obtained with another: rather, the judgment is reduced by settlement amounts received from other defendants. The presence of another legitimate target defendant in the case does not defeat successor liability against another legitimate defendant. Indeed, in *Ray* v. *Alad* the Regents of the University of California were named as codefendants because Ray fell while doing contracting work for his outside employer on a University of California campus. The phrase "complete denial of redress" should be construed to mean the complete denial of redress against a major defendant in the chain of commerce, be it manufacturer or distributor. As in any products liability case, the original manufacturer may be unavailable, or, as here, amenable to settlement substantially less than the amount of the eventual judgment.

The successor liability of Western MacArthur is consistent with the oft-repeated social policies of the law of products liability and the compensation of innocent plaintiffs injured by a defective product. Accordingly, we affirm the ruling of the trial court.

III*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*See footnote, *ante,* page 445.

## IV

We affirm the finding of successor liability in *Kaminski,* and find no reversible error at the remaining phases of trial. Accordingly, the judgment in *Kaminski* v. *Western MacArthur Company* (A028702) is affirmed in all respects.

■ In the remaining cases before us, the Superior Court of Alameda County determined the issue of successorship on summary judgment. The court found no triable issue of material fact that could refute successorship, but appeared to make its determination not under *Ray* but traditional theories of corporate continuation. As we indicated at oral argument, we assume that under familiar principles of res judicata and collateral estoppel, Western MacArthur will be bound in the Alameda cases by our affirmance of its successor liability in *Kaminski.* In that case, the factual context of the takeover of Western Asbestos has been fully litigated; the premise of the writ petitions, however, is that the question of successorship was erroneously decided on summary judgment and the issue should be litigated at trial. Since it has already been litigated with obvious res judicata effect, the issue posed by the writ petitions is academic. In A030047, A030125, and A031922, the petitions for writ of mandate are denied. In A029762, which has been submitted on the writ petitions, the judgment is affirmed.

King, J., and Haning, J., concurred.

The petition of appellant Western MacArthur Company for review by the Supreme Court was denied February 26, 1986.