[No. B079266. Second Dist., Div. Seven. May 28, 1996.]

MILTON JENKINS et al., Plaintiffs and Appellants, v.
T&N PLC, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1 this opinion is certified for partial publication. The portions directed to be published are: the first paragraph of the opinion, the first five paragraphs and the last paragraph of the Factual Background, the first paragraph of the Procedural Background, part 2 of the Discussion, and the Disposition.

**COUNSEL**

Davis & Thomas, Joseph D. Davis, Thomas D. Thomas and Charlotte E. Costan for Plaintiffs and Appellants.

Haight, Brown & Bonesteel, Roy G. Weatherup, William J. Sayers, Lisa L. Oberg and Caroline E. Chan for Defendant and Appellant.

## OPINION

**WOODS (Fred), J.**—Defendant T&N PLC[1] filed an appeal from a judgment on a special verdict in favor of plaintiffs, awarding plaintiff Milton Jenkins $1,109,740 and plaintiff Maxine Jenkins $743,750. Defendant also appealed the trial court's order taking off calendar its motion to amend the judgment as to plaintiffs' settlement with defendant Fibreboard Corporation. Plaintiffs cross-appealed the trial court's application of Proposition 51.[2]

### FACTUAL BACKGROUND

Plaintiff Milton Jenkins was exposed to asbestos dust while working for St. Louis Southwestern Railroad as a yard clerk in 1942, 1946, and 1947, and while working on asbestos-containing pipe insulation when serving in the United States Navy from 1943 through 1945 and from 1951 through 1952.

No one warned Mr. Jenkins that being around asbestos dust might be hazardous to his health. Mr. Jenkins thought he worked safely with asbestos products.

Mr. Jenkins recalled that the logo on the boxes of pipe insulation that he worked with in the military, depicted a "very prominent" "kitty-cat." This logo was used by Keasbey & Mattison, a wholly owned subsidiary corporation of T&N which dissolved in 1962.

The raw asbestos fibers in Keasbey & Mattison's pipe insulation were supplied in bulk by T&N. According to the deposition testimony of Sir Ralph Bateman, a former chairman of T&N, Keasbey & Mattison bought all its fibers from Raw Asbestos Distributors,[3] a T&N division. Sir Bateman began working for T&N as a management trainee in 1931, transferred from Turner Brothers Asbestos or TBA, a T&N subsidiary, to R.A.D. in 1940 or 1941, was promoted to director of R.A.D. in 1942, 1943 or 1944, and returned to TBA in 1948.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

In 1991, Mr. Jenkins was diagnosed with mesothelioma. According to the Jenkinses' medical expert, pathologist Victor Roggli, M.D., mesothelioma is

---

[1]T&N was sued under the name "Turner & Newell, PLC"; it answered the complaint as "T&N PLC."

[2]Proposition 51 is codified under Civil Code sections 1431 through 1431.5.

[3]Raw Asbestos Distributors or R.A.D. changed its name to Turner Asbestors Fibers (T.A.F.) about 1962, and the name was changed a second time to T.A.F. International in the early 1980's. This division of T&N will be referred to as R.A.D.

*See footnote, *ante,* page 1224.

a latent, asbestos associated disease which can develop 30 to 40 years after exposure to asbestos. T&N's medical expert, pathologist John Craighead, M.D., admitted on cross-examination that he wrote an article stating that the type of mesothelioma which Mr. Jenkins contracted is exceptionally rare or never occurs in people not exposed to asbestos.

### Procedural Background

On May 29, 1992, the Jenkinses filed a complaint for personal injuries against multiple defendants, including T&N. The complaint contained causes of action for strict liability and loss of consortium. In addition to general and special damages, the Jenkinses sought damages for loss of earnings, income and earning capacity.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

### Discussion

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

1. *Did the trial court allow plaintiffs' counsel to argue about alter ego liability? If so, was this error, and was it error for the trial court to not give a jury instruction against the alter ego theory of liability?**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. ▮▮▮ *Does the strict products liability doctrine apply to a bulk supplier of raw asbestos fiber who has not made any finished consumer product?*

Since it is not disputed that T&N was a bulk supplier of raw asbestos fiber who did not make any finished product, the independent review or de novo standard applies. Under this standard of review, the appellate court decides the issue anew, rather than defer to the trial court. (*Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Edgemont Community Service Dist.* v. *City of Moreno Valley* (1995) 36 Cal.App.4th 1157, 1166 [42 Cal.Rptr.2d 823].)

The strict products liability doctrine was established in California through *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. There, the state Supreme Court held

---

*See footnote, *ante*, page 1224.

that a "manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Id.* at p. 62.) The strict liability theory was then embodied in the Restatement Second of Torts section 402A. (6 Witkin, Summary of Cal. Law (9th ed. 1988) § 1243, p. 678.)

Section 402A of the Restatement Second of Torts provides in pertinent part: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer . . . if [¶] (a) the seller is engaged in the business of selling such a product, and [¶] (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. [¶] (2) The rule stated in Subsection (1) applies although [¶] (a) the seller has exercised all possible care in the preparation and sale of his product, and [¶] (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

California adopted the Restatement Second of Torts section 402A. (See, e.g., *Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 250 [71 Cal.Rptr. 306].)

T&N contends that a component raw material incorporated into a finished consumer product does not constitute a "product" for strict liability purposes. However, a "component part manufacturer may be held liable for damages caused by a component part which was defective at the time it left the component part manufacturer's factory." (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248].) Contrary to T&N's contention that the *Wiler* opinion does not apply because the defect there was a valve attached to a car tire, the ruling is applicable whenever the component part was defective when supplied to the manufacturer of the finished product incorporating the component part.

T&N's argument that raw asbestos fibers cannot constitute a "product" for strict liability purposes also lacks merit. Although this issue apparently has not been specifically addressed in published California court opinions, it has been analyzed in other jurisdictions which, like California, have adopted the Restatement Second of Torts section 402A. (See *Hammond* v. *North American Asbestos Corp.* (1983) 97 Ill.2d 195 [73 Ill.Dec. 350, 454 N.E.2d 210, 39 A.L.R.4th 385] and *Menna* v. *Johns-Manville Corp.* (D.N.J. 1984) 585 F.Supp. 1178.)

In *Hammond, supra,* a supplier of raw asbestos fibers was subject to strict products liability to the wife of a worker exposed to asbestos dust at his place of employment. Quoting the Illinois appellate court, the Illinois Supreme Court adopted the state appellate court's reasoning: " '[W]e conclude that raw asbestos is a product within the meaning of the Restatement. Although raw asbestos is processed before it is ultimately sold to consumers, raw asbestos and not some manufactured article caused the harm in this case. There was no change in the condition of the asbestos from the time it was sold until it reached the "ultimate user," Charles Hammond. Moreover, the argument that but for the manufacturing process the asbestos would not have been altered begs the questions. [¶] *The evidence showed clearly that handling asbestos in any form produces dust. Liability may be imposed in a products case if the injury results from a condition of the product and the condition is unreasonably dangerous and existed when the product left the defendant's control.* . . . The proclivity of raw asbestos to give off dust was certainly a condition that existed when the product left defendant's control.' " (*Hammond* v. *North American Asbestos Corp., supra,* 454 N.E.2d at p. 216, italics added, citations omitted.)

T&N argues that *Hammond* is inapposite partly because it concerned an employee of a manufacturer of asbestos-containing products who handled, opened and processed bags of raw asbestos. This argument conflicts with the Illinois Supreme Court's broad interpretation of the term "product" within the meaning of the Restatement Second of Torts section 402A. We adopt the analysis made in *Hammond.*

Citing *Hammond,* the United States District Court for the District of New Jersey in *Menna* v. *Johns-Manville Corp., supra,* 585 F.Supp. at page 1183, acknowledged that "[i]t is well documented that exposure to asbestos dust can have pathological consequences whether the dust emanates from processed or unprocessed asbestos." Accordingly, the district court refused to shift liability from the asbestos suppliers to the plaintiffs' former employer.

Since both *Hammond, supra,* and *Menna, supra,* as well as the evidence in the present case, indicate that the raw asbestos fibers do not change after becoming a component part of pipe insulation, raw asbetos fibers come under the definition of a "product." Section 4 of the Restatement Third of Torts (tent. draft No. 2, Mar. 13, 1995) supports the broad scope of the strict liability doctrine. Subdivision (a) of section 4 defines a "product" as "something distributed commercially for use or consumption. Most but not necessarily all products are tangible personal property; most have been subjected to processing and fabricating prior to entering the stream of commerce; and most pass through a commercial chain of distribution before ultimate use and consumption."

Accordingly, we reject T&N's attempt to distinguish *Kaminski* v. *Western MacArthur Co.* (1985) 175 Cal.App.3d 445, 456 [220 Cal.Rptr. 895] on the basis that the defendant there distributed finished asbestos cloth and insulation products.

Similarly, we reject T&N's argument that *Kaminski* is distinguishable because it is based on a successor's liability for a predecessor's product. California case law holds that the doctrine of strict liability applies to anyone who places asbestos into the stream of commerce. The appellate court in *Kaminski,* in fact, ruled that "[i]n products liability cases, a consumer injured by a defective product may sue any business entity in the chain of production and marketing, from the original manufacturer down through the distributor and wholesaler to the retailer . . . ." (*Kaminski* v. *Western MacArthur Co., supra,* 175 Cal.App.3d at pp. 455-456.)

As noted in *Barth* v. *B.F. Goodrich Tire Co., supra,* 265 Cal.App.2d at pages 250-251, "Comment f of the Restatement Second of Torts points out that as to the business of selling, the doctrine of strict liability applies to *any person engaged in the business of selling products for use or consumption therefore including any manufacturer, wholesaler or retail dealer or distributor* . . . . It is not necessary that the seller be engaged solely in the business of selling such products. The only group of persons exempted from the rule is the occasional seller who is not engaged in that activity as part of his business, like a housewife who, on occasion, sells to her neighbor a jar of jam or a pound of sugar. The Restatement comment further points out that the basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products that may endanger the safety of their persons and property and the forced reliance on that undertaking on the part of those who purchase such goods." (Italics in original.)

Although *Lineaweaver* v. *Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 [37 Cal.Rptr.2d 902] is an asbestos case based on a negligence cause of action as opposed to a strict products liability cause of action, this case is persuasive in finding a supplier liable in tort for a plaintiff's disease caused by inhalation of absestos fibers at the plaintiff's place of work. While employed at a Standard Oil refinery, plaintiff Robert Lineaweaver cleaned up asbestos debris, ripped out old insulation and worked near asbestos dust. Defendant Plant Insulation Company (referred to as Plant) was a significant

supplier of insulation products at the refinery. These products were marketed under the Pabco trademark.

The appellate court in *Lineaweaver, supra,* found the following circumstantial evidence sufficient in showing that plaintiff was exposed to defendant supplier's asbestos-containing insulation: "(1) Plant was the exclusive distributor in Northern California of Pabco asbestos insulation products beginning in 1948; (2) Lineaweaver worked at the Standard Oil refinery from 1950 to 1984, repeatedly working with and around asbestos insulation; (3) Lineaweaver worked throughout the sprawling refinery which has insulation over about two-thirds of its pipes and much of its equipment; (4) Lineaweaver saw boxes of Pabco products at the refinery; (5) Plant was a significant supplier of asbestos products, performing about 50 percent of the insulating work at the refinery in the 1960's; (6) another major insulation contractor used Pabco and another product as 'fill-in' supplies which constituted 10 to 15 percent of the refinery's insulation installed by that contractor." (*Lineaweaver* v. *Plant Insulation Co., supra,* 31 Cal.App.4th at pp. 1419-1420.)

Since a negligence cause of action is more stringent than a strict products liability cause of action, there is no reason to preclude a supplier's liability for the latter cause of action. A negligence cause of action requires the defendant's breach of a legal duty to use due care, and this breach is the legal cause of the plaintiff's resulting injury. (6 Witkin, Summary of Cal. Law (9th ed. 1988) § 732, p. 60.) Unlike a negligence theory of liability, a strict products liability theory does not focus on the defendant's duty to use due care; the defendant's behavior is irrelevant. At the same time, both theories of liability require that the defendant's defective product was a legal cause of the plaintiff's injury. Regardless of which theory of liability is asserted, ". . . where a plaintiff alleges a product is defective, proof that the product has malfunctioned is essential to establish liability for an injury *caused by the defect.*" (*Khan* v. *Shiley Inc.* (1990) 217 Cal.App.3d 848, 855 [266 Cal.Rptr. 106], original italics.)

As a matter of law, a bulk supplier of raw asbestos fiber incorporated into a finished product can be subject to strict products liability to an individual suffering from a disease caused by exposure to the supplier's asbestos.

3.-9.*

. . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 1224.

## DISPOSITION

The judgment is affirmed. Both sides to bear their own costs on appeal.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied June 18, 1996, and the petition of appellant T&N PLC for review by the Supreme Court was denied September 25, 1996.