Filed 12/2/13  Ibarra v. Todey Motor Co. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| FERNANDO IBARRA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TODEY MOTOR CO., INC., <br><br> Defendant and Respondent. | 2d Civil No. B242386 <br> (Super. Ct. No. 56-2010-00370413-CL-PL-VTA) <br> (Ventura County) |

A half century has passed since the California Supreme Court embraced the principle of strict liability in tort for defective products.  (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57.)  This was driven by the belief that "the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63.)  A year later the court extended the principle to automobile dealerships.  (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263.)  Here we hold that an automobile dealership that inspects and delivers a new vehicle sold by its franchisor can be held strictly liable as the last link in the chain moving the product to the consumer.

General Motors Company (GM) sold a new Chevrolet truck to a national account customer.  GM shipped the truck to one of its franchised Chevrolet dealers, respondent Todey Motor Co., Inc. (Todey), which inspected the vehicle before delivering

it to the customer.  Eight years later, appellant Fernando Ibarra (Ibarra) was seriously injured in a "rollover" accident while driving the truck.  He and his wife, Bertha Ibarra, brought this action against Todey for strict liability, negligence, breach of warranty and loss of consortium.  The trial court granted Todey's motion for summary judgment.

Todey's inspection and delivery of the truck placed it within the vertical chain of distribution for purposes of imposing strict liability for manufacturing or design defects.  The trial court erred in concluding otherwise.  We reverse as to the strict liability and loss of consortium claims, but affirm the summary adjudication of the negligence and breach of warranty causes of action.

### FACTS AND PROCEDURAL BACKGROUND[1]

From 1991 through 2009, Todey was a franchised dealer of Chevrolet vehicles in Southern California.  It was authorized to sell certain new Chevrolet vehicles to the retail public, to service GM national accounts and to trade vehicles with other dealerships.  During its tenure as a franchised dealer, Todey grossed $600 million in Chevrolet sales and $500,000 in service revenue.

Typically, when a franchised dealer sells a new vehicle, it purchases the vehicle from the original equipment manufacturer and then, after placing the vehicle into its inventory, offers it for sale to the public.  GM national account customers, however, do not purchase new vehicles from franchised dealers; they purchase them directly from GM as the original equipment manufacturer.  The United States General Services Administration (GSA), which procures motor vehicles for use by federal agencies, is a GM national account customer.

In April 2000, the GSA ordered a new 2000 Chevrolet C3500 Crew Pickup ("Pickup") for use on the naval base in Pt. Mugu, California.  GM sold the Pickup directly to GSA.  Although Todey was authorized to sell new Chevrolet C3500 Crew Pickups, it was not involved in the purchase transaction.  It also did not design or manufacture the Pickup or any of its components.

---

[1] Our factual statement is based upon the undisputed or established facts appearing in the moving and opposing papers on summary judgment.

GM requires a pre-delivery inspection of every new vehicle, whether sold by a dealer to the public or by GM to a national account customer. Pre-delivery inspections generally involve removal of temporary covers used to protect the vehicle during transit, installation of certain non-essential accessories, such as roof racks, general operation checks, and verifying compliance with California Vehicle Code requirements. They do not involve checks for design defects or vehicle handling characteristics, vehicle stability, roof strength or crashworthiness.

At GM's direction, Todey performed the pre-delivery inspection of the Pickup. When the vehicle arrived from the plant, Todey assigned it a "stock number," which typically indicates the vehicle is in the dealership's inventory. In fact, Todey "never took the Pickup into inventory." The records show that Todey performed a "Z7000 - PRE-DELIVERY INSPECTION - BASE TIME," for a total cost of $74.56. The price was set by GM based on the type of vehicle. Todey then delivered the truck to the customer. Todey did not realize any profit from the inspection or delivery.

On two or three subsequent occasions, Todey serviced the Pickup at GSA's request, repairing a missing inside door handle bezel, replacing a fuel tank pressure sensor and performing an oil and filter change. The repairs did not involve the Pickup's stability, handling, roof strength, crashworthiness or seatbelts.

Ibarra's employer purchased the Pickup in 2007. In 2008, Ibarra was paralyzed in a rollover accident while driving the Pickup. The Ibarras sued Paradise Chevrolet and Nationwide Mutual Insurance for damages stemming from the accident. The Ibarras amended the complaint to add claims against Todey for strict liability, negligence, breach of warranty and loss of consortium based on alleged design and manufacturing defects in the Pickup, including issues with the seatbelts. GM is not involved, apparently due to its bankruptcy status.

Todey moved for summary judgment or adjudication, contending that it was not strictly liable because it did not place the Pickup in the stream of commerce, that it had no duty to detect the alleged defects during its pre-delivery inspection and that it was not liable for breach of warranty because it did not sell the vehicle. The Ibarras

3

responded that California law holds franchisees strictly liable for products they distribute, that Todey had a duty of ordinary care when inspecting the Pickup and that Todey failed to submit any relevant evidence on causation.

The trial court expressed concern that "because [Todey] sell[s] Chevrolets, that makes them a seller, makes them a dealer, and as a result, just because of that fact, this being a product for which they are a dealer, that . . . puts them into the stream of commerce [or] the stream of sale." After taking the matter under submission, the court granted summary judgment, concluding that Todey did not place the vehicle into the stream of commerce, had no duty of care and did not breach any warranty. The court determined that Todey was just "a pass-through for the subject vehicle" and that "imposing [strict] liability . . . would serve none of the policies that justify the doctrine." The Ibarras appeal, but do not challenge the ruling on the breach of warranty claim.

DISCUSSION

*Standard of Review*

Summary judgment is proper where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) To prevail on a summary judgment motion, the moving defendant has the initial burden to show a cause of action has no merit because an element of the claim cannot be established or there is a complete defense to the cause of action. (*Id.* at subd. (o); *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) To satisfy this burden, the defendant must present evidence which either conclusively negates an element of the plaintiff's cause of action, or which shows the plaintiff does not possess, and cannot reasonably obtain, needed evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855.) Once the defendant has made this showing, the burden shifts to the plaintiff to set forth specific facts which show a triable issue of material fact exists. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.)

We review the trial court's decision de novo, considering all the evidence presented by the parties (except evidence properly excluded by the trial court) and the uncontradicted inferences reasonably supported by the evidence. (*Merrill v. Navegar,*

4

*Inc., supra,* 26 Cal.4th at p. 476.)  The evidence is viewed in the light most favorable to the plaintiff, liberally construing the plaintiff's submissions while strictly scrutinizing the defendant's showing, and resolving any evidentiary doubts or ambiguities in the plaintiff's favor.  (*Saelzler v. Advanced Group 400, supra*, 25 Cal.4th at p. 768.)

*Strict Liability*

The doctrine of strict liability insures that the costs of injuries resulting from defective products are borne by the "overall producing and marketing enterprise." (*Vandermark v. Ford Motor Co., supra,* 61 Cal.2d at p. 262.)  The doctrine applies not only to manufacturers of products, but also to others in the vertical chain of distribution, including wholesale and retail distributors, licensors and lessors of personal property. (*Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1535 (*Arriaga*).)  Courts recognize that those in the vertical chain, even if not involved in the manufacture or design of the product, are "responsible for passing the product down the line to the consumer and are able to bear the cost of compensating for injuries."  (*Ibid.*; *Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1198-1199.)

Todey asserts that *Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, defines the limitations on strict products liability.  In *Bay Summit*, a non-defective part manufactured by the defendant was used in a defective plumbing system.  The defendant actively marketed the plumbing system and played an integral role in bringing it to the consumer market. (*Id.* at pp. 776-777.)  The court outlined a three-part test to assess whether a defendant may be held strictly liable for a defective product when it was outside the vertical chain of distribution but involved in the marketing process:  "(1) [T]he defendant received a direct financial benefit from its activities and from the sale of the product; (2) [its] role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) [it] had control over, or a substantial ability to influence, the manufacturing or distribution process." (*Id.* at p. 776.)  This test does not apply, however, to those within the product's vertical chain of distribution. (*Arriaga, supra*, 167 Cal.App.4th at pp. 1534-1535; *McCarty v. Johnson & Johnson*

(E.D. Cal. 2010) 2010 WL 2629913, *4 [*Bay Summit* test "applied to participants *outside* the chain of distribution"].) "The doctrine of strict products liability imposes fault on all participants in the chain of distribution . . . ." (*Bailey v. Safeway, Inc.* (2011) 199 Cal.App.4th 206, 213 (*Bailey*).)

Typically, the vertical chain of distribution ends when the product reaches the consumer. (See *Cary v. Charmichael* (E.D.Va. 1995) 908 F.Supp. 1334, 1352.) Relying heavily upon *Barth v. B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 (*Barth*), the Ibarras assert that because Todey performed the final inspection before delivering the Pickup, it is strictly liable as part of the vertical chain. (See *Bailey, supra,* 199 Cal.App.4th at p. 213.) Although *Barth* is distinguishable, it is instructive.

The defendant in *Barth* was an authorized dealer of Goodrich tires. It sold tires to the public and also serviced Goodrich's national fleet accounts. (*Barth, supra*, 265 Cal.App.2d at p. 248-249.) An employee of one of those national accounts sued the defendant, alleging it was strictly liable for installing a defective tire on his corporate car. The employee had ordered two tires from another Goodrich distributor, which arranged for the defendant to deliver and install the tires. (*Ibid.*) After pulling the tires from its own stock, the defendant issued an invoice stating "the tires were sold to Goodrich." (*Id.* at p. 249.) Goodrich allowed the defendant a service charge for the transaction along with a credit for the tires taken from its stock, plus a $4.13 installation fee. (*Ibid.*) Because it did not profit from the transaction, the defendant claimed it was merely a conduit for a sale made by Goodrich. (*Id.* at p. 251.)

The trial court instructed the jury the defendant could be liable only if it had sold the defective tire to the customer. (*Barth, supra*, 265 Cal.App.2d at pp. 248-250.) The Court of Appeal reversed, concluding the defendant was subject to strict liability as "*part of the overall marketing enterprise for Goodrich tires*." (*Id.* at p. 252.) The court observed that "[a]s an authorized Goodrich distributor, [the defendant] benefited from servicing Goodrich's national accounts . . . . The tire in question was removed from [its] stock of tires, and besides the installation fee, [it] received a credit from Goodrich for the cost to it of the tire." (*Ibid*.) The court explained that "the reasons for placing losses due

6

to defective products on the manufacturers and suppliers are to provide maximum protection for the consumer and the fact that the overall producing and marketing enterprise is in a better position to insure against the liability and to distribute it to the public by adding the cost thereof to the price of the product." (*Id.* at pp. 252-253; *Greenman v. Yuba Power Products, Inc., supra,* 59 Cal.2d at pp. 63-64.) The court remarked that "'[t]he rationale of risk spreading and compensating the victim . . . would seem to apply not only in cases involving personal injuries arising from the *sale* of defective goods, but equally to any case where an injury results from the risk creating conduct of the seller *in any stage of the production and distribution of goods.*'" (*Barth,* at p. 253, quoting Prosser, *Strict Liability to the Consumer in California*, 18 Hastings L.J. 9, 20, fn. 62; see *Lewis v. American Hoist & Derrick Co.* (1971) 20 Cal.App.3d 570, 586-587.)

Unlike in *Barth*, Todey did not pull the product from its own stock and invoice the manufacturer for its cost. Nor was the product ordered through Todey or another GM retailer. Todey's involvement in the sale was more limited, but it still played a role in getting the product from its franchisor to the consumer. It also benefitted from servicing GM's national accounts. The question is whether that was enough to expose Todey to strict liability as "*part of the overall marketing enterprise*" for new Chevrolet vehicles delivered through its dealership. (*Barth, supra*, 265 Cal.App.2d at p. 252.) We conclude that it was.

"[S]trict liability is not imposed even if the defendant is technically a 'link in the chain' in getting the product to the consumer market if the judicially perceived policy considerations are not satisfied. Thus, a defendant will not be held strictly liable unless doing so will enhance product safety, maximize protection to the injured plaintiff, and apportion costs among the defendants." (*Arriaga, supra,* 167 Cal.App.4th at p. 1537.) *Arriaga* considered whether a finance lessor should be held strictly liable for financing the purchase of a defective product. The court determined that "unlike a retailer or a commercial lessor, the finance lessor does not maintain an ongoing relationship with a particular manufacturer. Thus, the finance lessor is not in any position

7

to either directly or indirectly exert pressure on the manufacturer to enhance the safety of the product. Therefore, even if the finance lessor's tangential function of providing money to make the purchase possible is characterized as a link in the vertical chain of distribution, imposing strict liability on that finance lessor will not further a critical policy consideration. In other words, strict liability is not justified by the underlying policy." (*Id.* at p. 1538.)

Here, strict liability is justified by the underlying policy. Todey did not play a "random and accidental" role in getting the Pickup to the consumer. (*Garcia v. Halsett* (1970) 3 Cal.App.3d 319, 326; *Tauber-Arons Auctioneers Co. v. Superior Court* (1980) 101 Cal.App.3d 268, 277.) As a franchised Chevrolet dealer, Todey's principal business was to market, sell and deliver new Chevrolet vehicles to consumers. It is undisputed that Todey grossed $600 million in Chevrolet sales during its association with GM. It also is undisputed that GM required Todey to perform a pre-delivery inspection on every new Chevrolet passing through its dealership, including those sold to national account customers. "Where purchase of a product is the primary objective or essence of the transaction, strict liability applies even to those who are mere conduits in distributing the product to the consumer." (*Pierson v. Sharp Memorial Hospital, Inc.* (1989) 216 Cal.App.3d 340, 344.)

Given its substantial ongoing relationship with its franchisor, Todey was in a position to either directly or indirectly exert pressure on GM to enhance the safety of Chevrolet vehicles. (*Vandermark v. Ford Motor Co.*, *supra,* 61 Cal.2d at pp. 262-263; *Arriaga, supra,* 167 Cal.App.4th at p. 1534 ["strict liability leads to enhanced product safety since retailers are in a position to exert pressure on manufacturers"].) Todey also was in a position to share with GM the costs of ensuring product safety. (*Vandermark*, at pp. 262-263; *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 363.) Todey could have purchased insurance, raised the prices of the Chevrolet vehicles that it sold or negotiated with GM to receive greater compensation for servicing national accounts. As explained in *Kaminski v. Western MacArthur Co.* (1985) 175 Cal.App.3d 445, 457, retailers and distributors are "in a better position than the plaintiff to insure against the risks. [They

8

also are] in a better position to engage in negotiations with the manufacturer to share the costs of such risks, and to minimize the risk of injury by taking appropriate measures, such as warning labels, or to engage in a detailed study of the hazards of a familiar product."

The cases emphasized by Todey's counsel during oral argument do not alter this analysis. *Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, involved the application of strict liability to a nonmanufacturing party outside the vertical chain of distribution. It did not address the liability of those parties within the chain. (*Id.* at pp. 718, 724 [licensor who retains "right to inspect and control the quality" of product could be strictly liable as an "integral component[ ] of the . . . enterprise responsible for placing . . . products on the market"].) The same is true of *Larosa v. Superior Court* (1981) 122 Cal.App.3d 741, 753-761, which held that the policy reasons for imposing strict liability on parties within the vertical chain did not apply to dealers in used goods. *Larosa* observed, inter alia, that the "dealer [of used goods] who is *not* integrally involved in the initial manufacturing-marketing-distributing process will lack the initial retailer's or distributor's ability to join other integral members of the initial process and to require them to 'adjust the costs of such protection between them in the course of their continuing business relationship.' [Citation.]" (*Id.* at p. 753.)

The fundamental purpose of applying strict liability to retailers and distributors of new products is to shift the cost of injuries away from consumers. (*Vandermark, supra,* 61 Cal.2d at pp. 262-263.) If a distributor's involvement in a merchandising venture results in it being exposed to strict liability, the solution "is to seek indemnity against the responsible manufacturer, not to avoid . . . liability vis-à-vis the injured plaintiff." (*Kaminski v. Western MacArthur Co., supra,* 175 Cal.App.3d at p. 456.) Even when that option may not be available, such as when the manufacturer has filed bankruptcy or is out of business, public policy dictates that it is better to hold others in the distribution chain responsible than to leave the injured victims uncompensated. (*Vandermark,* at pp. 262-263.)

9

Although Todey did not sell the Pickup, it was the last link in getting the vehicle from its franchisor to the consumer.  The trial court erred in concluding that Todey was outside the chain of distribution and could not be held strictly liable for manufacturing or design defects in the Pickup.  Because Todey is subject to strict liability, Bertha Ibarra also may maintain her cause of action for loss of consortium on that theory.

*Negligence*

A successful negligence claim requires the plaintiff to show that the defendant owed the plaintiff a legal duty, which it breached, causing the plaintiff's injuries.  (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917-918.)  The Ibarras' complaint generally alleges that Todey and others "negligently . . . tested, distributed, sold, inspected, marketed, warranted, warned, instructed, advertised, serviced, repaired, maintained, leased, rented, vended, installed, handled, and furnished the SUBJECT VEHICLE and each and every component part thereof."  It contains no specific allegations regarding Todey's purported negligence.

Todey established that it did not design or manufacture the Pickup or any of its components, and that its function was to deliver the vehicle after performing the pre-delivery inspection.  It further established that pre-delivery inspections do not involve an examination of the handling characteristics, stability, roof strength or crashworthiness of the vehicle.  They involve the removal of temporary protective covers, installation of certain non-essential factory accessories, verification of compliance with the California Vehicle Code and confirmation that the vehicle is generally operable.

Once Todey introduced this evidence, the burden shifted to the Ibarras to produce admissible evidence showing a triable issue of material fact on the issue of Todey's negligence.  (*Merrill v. Navegar, Inc., supra,* 26 Cal.4th at pp. 476-477.)  Not only did they fail to offer any evidence, but they also did not identify the specific legal duty owed by Todey or discuss how a breach of that duty caused Ibarra's injuries.  The trial court aptly observed that "[w]e are clearly at a stage of these proceeding[s] where a duty (and an allegation of a breach thereof) should be identifiable."

10

On appeal, the Ibarras assert that Todey owed them a duty under Civil Code section 1714, subdivision (a), which generally imposes liability for injuries caused by the failure to exercise reasonable care under the circumstances. They claim that Todey had a duty to inspect for defects in the seatbelts and that if it had properly performed the pre-delivery inspection, it would have discovered the defects that caused Ibarra's injuries eight years later. Even if we assume that Todey had such a duty, the Ibarras have not raised a triable issue of material fact regarding its breach. Claims and theories not supported by admissible evidence do not raise a triable issue. (*Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 219, disapproved on other grounds in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238; see *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 [evidence giving rise to no more than mere speculation insufficient to establish triable issue].) Summary adjudication of the negligence claim was proper.

## DISPOSITION

The judgment is reversed with directions to the trial court to vacate the order granting summary judgment and to enter a new order granting summary adjudication of the negligence and breach of warranty causes of action and otherwise denying the motion for summary judgment or summary adjudication. The Ibarras are awarded costs on appeal.

NOT TO BE PUBLISHED.


                                        PERREN, J.

We concur:


        GILBERT, P. J.


        YEGAN, J.


11

Rebecca S. Riley, Judge

Superior Court County of Ventura

_____

Mardirossian & Associates, Inc., Garo Mardirossian, Armen Akaragian; The Ehrlich Law Firm, Jeffrey Isaac Ehrlich for Appellants.

Bowman and Brooke, Vincent Galvin, Jr., Neil M. Kliebenstein; Wayne D. Struble, *pro hac vice*, for Respondent.