IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| EDWARD P. LEREN, as Executor of the Estate of Marvin A. Leren, | ) ) ) | No. 77870-6-I |
| Respondent, | ) ) | |
| v. | ) ) | |
| KAISER GYPSUM COMPANY, INC., et al, | ) ) ) | |
| Defendants. | ) ) | |
| ELEMENTIS CHEMICALS, INC., | ) ) | PUBLISHED OPINION |
| Appellant. | ) ) ) | FILED: May 28, 2019 |

VERELLEN, J. — We are asked to resolve whether the product line doctrine of successor liability applies to a distributor of raw asbestos where the acquired distributor faces strict liability under section 402A of the Restatement (Second) of Torts. We conclude the product line doctrine applies.

The purpose of the product line doctrine is to afford a product liability victim with a meaningful remedy when a successor business entity acquires the assets of a predecessor, leaving a mere corporate shell. Although stock purchasers are generally not responsible for the conduct of the companies in which they invest, if a business entity buys 100 percent of a corporation's stock in a single transaction and promptly begins the process of dissolving the corporation, thereby acquiring

the predecessor's assets, then a court may look past the form of the combined stock purchase and dissolution to recognize the substance of an asset acquisition. And if, after acquiring the assets, the purchaser avails itself of the goodwill associated with the distributor's sales of unreasonably dangerous materials by holding itself out as a continuation of the acquired distributor, then the purpose, policy, and logic of the product line doctrine applies.

Additionally, the limitations period in RCW 23B.14.340 regarding claims against dissolved corporations and their shareholders does not apply to defeat the product line doctrine of successor liability.

A jury award of noneconomic damages is sustainable under the wrongful death and survivor statutes where the required beneficiary under RCW 4.20.020 is an adult child with compelling bonds of affinity that survived the stepparent's divorce.

Finally, the court properly declined to give a superseding cause instruction because the requesting party failed to show the decedent's employer had actual, specific knowledge of the harm from prolonged asbestos exposure.

Therefore, we affirm.

## FACTS

Marvin Leren graduated from Ballard High School in 1961 and went to work for the Z-Brick Company the following year. Leren worked at Z-Brick until 1981. Z-Brick made thin, decorative bricks. Benson Chemical Corporation supplied Z-Brick with raw asbestos used to make the bricks. Leren poured 100-pound

sacks of raw asbestos into large hoppers used to mix ingredients for the bricks. Pouring asbestos produced huge clouds of asbestos dust. After the bricks hardened, Leren cut them with a power saw, producing more dust. Generally, Z-Brick was "a mess" with "powder on the floor" and "particles floating in the air."[1] Leren never wore a mask or any other protective gear.

In 1969, Leren met and began dating fellow Z-Brick employee Gretha Zylstra. He soon met Zylstra's three-year-old daughter Jo because she accompanied Zylstra and Leren on their first date. Leren and Zylstra married in 1974. They divorced amicably in 1985.

During the springtime of 2015, Leren felt short of breath and began losing energy. In late September or early October of that year, he had a lung biopsy and began feeling "immense pain."[2] Soon after, he was diagnosed with the rare myloxoid variant of mesothelioma and began chemotherapy. Leren was admitted to the hospital after having a bad reaction to his first round of chemotherapy. He never left. Doctors placed him on palliative care. Leren made out a will on November 10, naming his brother Edward as administrator of his estate (the Estate), providing a monetary bequest to Jo. He filed a complaint seeking damages for negligence and product liability on November 19. He died on November 24, 2015.

---

[1] Report of Proceedings (RP) (Oct. 24, 2017) at 611.
[2] RP (Oct. 19, 2017) at 302-03.

3

The Estate maintained the lawsuit. Over the next 10 months, the Estate added a claim for wrongful death and added Elementis as a defendant. In the late 1970s, Harrisons & Crosfield (Pacific), Inc. (HCP) acquired 100 percent of Benson's stock and dissolved Benson as an independent company. Elementis is the undisputed successor to HCP.

Elementis was the sole defendant at trial. Based on the jury's special verdict and its own findings of fact, the court relied on the product line doctrine and entered judgment in favor of the Estate.

Elementis appeals.

## ANALYSIS

### I. Corporate Successor Liability

Leren alleged personal injuries from mesothelioma caused by frequent asbestos exposure. Because these exposures occurred prior to enactment of the Washington Product Liability Act,[3] we evaluate potential liability using common law principles embodied in the Restatement (Second) of Torts.[4] Under section 402A of the Restatement, strict liability may be imposed on any party involved in distributing an unreasonably dangerous product.[5] It is undisputed that asbestos is unreasonably dangerous and that Benson distributed the raw asbestos that

---

[3] Ch. 7.72 RCW.

[4] Simonetta v. Viad Corp., 165 Wn.2d 341, 348, 354, 197 P.3d 127 (2008).

[5] Id. at 354-55 (citing Seattle-First Nat. Bank v. Tabert, 86 Wn.2d 145, 148-49, 542 P.2d 774 (1975); Restatement (Second) of Torts § 402A cmt. f (1965)).

4

caused Leren's mesothelioma. The question is whether Elementis is liable for those sales based upon HCP's acquisition of Benson's assets.

Elementis argues it cannot be liable for Leren's injuries because HCP was a mere investor who acquired Benson's assets by automatic transfer upon dissolution rather than by purchase. The trial court disagreed. We review conclusions of law de novo.[6]

Generally, a successor corporation is not responsible for its predecessor's liabilities simply because it acquired the predecessor's assets.[7] But case law provides well-established exceptions.[8] In product liability cases, successor liability arises where one corporation benefits from another's goodwill after acquiring its product line.[9] Washington adopted the product line doctrine of corporate successor liability for the "essential purpose" of

> afford[ing] a products liability claimant an opportunity to bring an action against the successor corporation when his or her rights against the predecessor corporation have been essentially extinguished either de jure, through dissolution of the predecessor,

---

[6] Blackburn v. State, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016).

[7] Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc., 166 Wn.2d 475, 481-82, 209 P.3d 863 (2009) (citing Hall v. Armstrong Cork, Inc., 103 Wn.2d 258, 261-62, 692 P.2d 787 (1984)).

[8] Exceptions include where "(1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability." Martin v. Abbott Labs., 102 Wn.2d 581, 609, 689 P.2d 368 (1984). These four exceptions are not at issue here.

[9] Hall, 103 Wn.2d at 261-63; Martin, 102 Wn.2d at 609.

or de facto, through sale of all or substantially all of the assets of the predecessor.[10]

We consider the following questions to decide whether the product line doctrine applies: (1) did the successor acquire substantially all the predecessor's assets, leaving no more than a mere corporate shell, (2) did the successor hold itself out to the general public as a continuation of the predecessor by producing the same product line under a similar name, (3) did the successor benefit from the goodwill of the predecessor?[11]

Product line successor liability requires an asset transfer from predecessor to successor, though the transfer need not be a direct sale.[12] Our Supreme Court adopted the product line doctrine to protect "otherwise defenseless victims" by ensuring they can seek "meaningful remed[ies]" while simultaneously protecting corporations from unexpected liability by requiring "a causal connection between the successor's acquisition and the unavailability of the predecessor."[13] Reflecting this balance, a court should consider two issues when determining if these policy

---

[10] Hall, 103 Wn.2d at 264.

[11] Id. at 262-63 (quoting Martin, 102 Wn.2d at 614); Fox v. Sunmaster Prods., Inc., 63 Wn. App. 561, 570-71, 821 P.2d 502 (1991).

[12] See Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 135 Wn.2d 894, 901, 959 P.2d 1052 (1998) (Successor "[l]iability may be imposed regardless of the exact form of [the] transfer of assets between the corporations.") (citing Stoumbos v. Kilimnik, 988 F.2d 949, 961 (9th Cir. 1993) (citing Martin, 102 Wn.2d at 609)); see also Hall, 103 Wn.2d at 264 ("The policy justifications for our adoption of the product line [doctrine] require the transfer of substantially all of the predecessor's assets to the successor corporation as a prerequisite to imposing liability on the successor.") (emphasis added).

[13] Hall, 103 Wn.2d at 264-65.

concerns are present: first, whether an asset transfer of any kind occurred between an alleged predecessor and its alleged successor, and second, whether the successor corporation by its acquisition actually "played some role in curtailing or destroying the claimants' remedies."[14] These questions turn on the substance of an asset transfer rather than its form.

Typically, when a plaintiff seeks to hold a successor strictly liable through the product line doctrine, a successor holds itself out as a continuation of the predecessor by continuing to manufacture and sell the predecessor's product line.[15] A manufacturer's goodwill is often associated with its specifically branded product lines. But section 402A allows strict liability for all sellers of unreasonably dangerous products, including distributors.[16] The goodwill for a distributor of raw materials is associated with the distributor's customer relationships and reputation for quality service, quality materials, reliability, and competitive pricing.[17] Thus, the goodwill transfer contemplated in the product line doctrine is "not that associated with individual products," but rather "that associated with the predecessor business entity."[18] Where a successor distributor acquires a predecessor's goodwill, holds itself out as akin to the predecessor by continuing to distribute similar

---

[14] Hall, 103 Wn.2d at 264, 265-66.

[15] See, e.g., Martin, 102 Wn.2d at 609-12.

[16] Simonetta, 165 Wn.2d at 354-55.

[17] RP (Oct. 24, 2017) at 696-98, 739.

[18] Hall, 103 Wn.2d at 267.

unreasonably dangerous products, and realizes benefits from those distributions, then the product line doctrine applies.

Elementis argues, though, that the product line doctrine is limited to manufacturers who produce unreasonably dangerous products because they can spread the cost of those products across their customer base. We disagree.

Consistent with the principles discussed above, California has held for over 30 years that a distributor of unreasonably dangerous goods may be strictly liable under the product line doctrine for its predecessor's conduct. In Kaminski v. Western MacArthur Company,[19] a former welder's assistant suffering from mesothelioma sued the successor of the distributor that sold asbestos products to his employer.

In 1967, the predecessor asbestos distributor, Western Asbestos Company, was struggling. It made an agreement with the MacArthur Company to turn over all operational control in exchange for a large loan of operating capital.[20] Western viewed the investment as a prelude to a purchase.[21] It notified customers and suppliers of the potential change but emphasized that longtime corporate officers would remain to share their expertise.[22] Seventeen months later, it was running out of money.[23] MacArthur announced Western would dissolve and would let

---

[19] 175 Cal. App. 3d 445, 450-51, 220 Cal. Rptr. 895 (Cal. Ct. App. 1985).
[20] Id. at 451.
[21] Id. at 452.
[22] Id.
[23] Id.

MacArthur purchase inventory and other assets equal to its debt, take over all outstanding contracts, and buy Western's records and customer lists.[24] MacArthur then created a new company, Western MacArthur Company, to do this work. The new company retained 90 percent of Western's employees, kept similar board members, kept similar customers, supplied the same products, referred to itself as "Western," and honored work orders made out to the dissolved Western.[25]

Under these facts, the court concluded the product line doctrine applied. It explained why the policy concerns underlying the doctrine were present:

> When a distributor or retailer acquires a corporation and takes advantage of its goodwill and other corporate assets and facilities to inject the predecessor's product line into the stream of commerce, it continues "the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products."[26]

The analysis in Kaminski is compelling. First, the court relied on our Supreme Court's reasoning in Hall v. Armstrong Cork, Inc.[27] and explained MacArthur used its financial leverage and operational control to "engineer a takeover."[28] Second, the "essence of the takeover" resulted in an asset transfer from Western to the new company that left the plaintiff without a meaningful remedy.[29] Third, the new company was better positioned than the plaintiff to guard

---

[24] Id. at 452-53.

[25] Id. at 453.

[26] Id. at 456 (quoting Vandermark v. Ford Motor Co., 61 Cal. 2d 256, 391 P.2d 168, 37 Cal. Rptr. 896 (1964)).

[27] 103 Wn.2d 258, 265-66, 692 P.2d 787 (1984).

[28] Kaminski, 175 Cal. App. at 458.

[29] Id.

against the risks of injury and to spread the costs of injury around by seeking indemnification from the product's manufacturer.[30] Thus, the court held the successor distributor was properly held liable because "[n]othing in [the product line doctrine] conceptually limits its reasoning to manufacturers."[31]

Similarly, the product line doctrine applies to HCP's acquisition of Benson. On January 10, 1977, HCP purchased 100 percent of Benson's stock from its founder and his wife.[32] Just five weeks later, HCP's board of directors voted to dissolve Benson.[33] HCP soon began making personnel decisions, including promoting a long-time Benson sales employee to regional manager and retaining Benson's founder as a consultant.[34] On June 14, 1977, HCP filed a statement of intent to dissolve Benson. On July 26, 1978, HCP filed Benson's articles of dissolution.[35] HCP then received all of Benson's assets.[36] HCP expressly identified Benson as a division, maintained largely the same suppliers and customers, and continued operating in the same region.[37] These details show a series of intentional steps to take control of Benson, making the company's assets

---

[30] Id. at 456-57.

[31] Id. at 456.

[32] RP (Oct. 24, 2017) at 587, 700.

[33] CP at 985.

[34] RP (Oct. 24, 2017) at 594-95, 701.

[35] CP at 107.

[36] RP (Oct. 24, 2017) at 736.

[37] Id. at 595-98, 712-13, 714-16; Ex. 90.

part of HCP and leveraging Benson's goodwill while extinguishing Leren's ability to hold Benson liable for his injuries. We agree with the Kaminski court that the rationale behind the product line doctrine applies to a distributor in these circumstances.[38]

As discussed, HCP acquired all of Benson's assets and left it "no more than a mere corporate shell."[39] And there can be no question that HCP held itself out as a continuation of Benson post-dissolution. Substantial evidence supports findings of fact 6, 11, 12, and 13, which, in turn, support the court's conclusions "that Benson Chemical's goodwill was transferred to HCP and that HCP benefited from Benson's goodwill in its sale of asbestos products to consumers."[40] For example, HCP, which did not operate in Washington or Oregon, acquired Benson's Pacific Northwest distribution network upon dissolution.[41] And long after Benson's dissolution, HCP continued to place ads describing Benson as a

---

[38] Elementis relies on another California case, Potlatch Corporation v. Superior Court of Riverside County, 154 Cal. App. 3d 1144, 1146, 201 Cal. Rptr. 750 (Cal. Ct. App. 1984), to argue a stock purchaser cannot be liable as a result of the purchase. But Potlatch is factually distinguishable, predates Kaminski, and, most importantly, the logic of Kaminski is apt and compelling.

[39] Martin, 102 Wn.2d at 614.

[40] CP at 989 (finding of fact 7). Findings of fact are supported by substantial evidence where there is sufficient evidence "'to persuade a rational, fair-minded person of the truth of the finding.'" Blackburn, 186 Wn.2d at 256 (quoting Hegwine v. Longview Fibre Co., 162 Wn.2d 340, 353, 172 P.3d 688 (2007)). When reviewing a jury verdict, we make all inferences in its favor. Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013). Unchallenged findings of fact are verities on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

[41] RP (Oct. 24, 2017) at 621-22, 677, 680.

division.[42] HCP also continued to use Benson's name when distributing goods, maintained the same office in Seattle, maintained the same phone number for the Seattle office, maintained many of the same employees, and honored Benson's outstanding contracts.[43] Further, it is undisputed Benson distributed raw asbestos before dissolution and HCP continued to distribute raw asbestos under Benson's name after dissolution.[44]

Elementis contends, though, sufficient evidence does not support the court's conclusion that it sold similar products as Benson because HCP sold only Union Carbide's brand of raw asbestos, whereas Benson sold only Johns-Manville's brand of raw asbestos before its dissolution.[45] Elementis is correct that the product line doctrine applies to a successor manufacturer where it continues producing the same product under a similar name,[46] but the doctrine does not limit liability to only those particular circumstances. The product line doctrine requires continued sales of "the same type of product" for a successor distributor to be held liable; the products do not need to be identical.[47] A

---

[42] Id. at 714-16; Ex. 90.

[43] Id. at 595-96, 701-02, 712-13, 717, 737.

[44] Id. at 718; see Exs. 270, 281 (Benson-branded invoices showing post-dissolution sales of raw asbestos in Washington and Oregon).

[45] Elementis does not argue that the raw asbestos distributed before and after the dissolution were different types or grades of asbestos.

[46] E.g., Martin, 102 Wn.2d at 614.

[47] See George v. Parke-Davis, 107 Wn.2d 584, 588, 590, 733 P.2d 507 (1987) ("The product line [doctrine] requires the corporation to manufacture the same type of product, and not merely stay in the same type of manufacturing business.") (emphasis added).

distributor's goodwill is necessarily associated with the grade, quality, and price of the raw materials it provides, regardless of the materials' brands. On this record, the Johns-Manville and Union Carbide brands of asbestos were the same type of product: raw white asbestos.

Benson's goodwill was associated with its ability to deliver raw asbestos generally, and HCP leveraged that goodwill to continue selling raw asbestos after it dissolved Benson. HCP benefitted from those sales. Accordingly, the policies, essential purpose, and requirements of the product line doctrine support holding Elementis strictly liable.[48]

Elementis argues Leren's recovery should be limited to the value of the corporate assets HCP received from Benson. Elementis relies on <u>Lonsdale v. Chesterfield</u>[49] and <u>Smith v. Sea Ventures, Inc.</u>[50] for this proposition. Neither case is compelling because, unlike the instant case, both involve lawsuits against a dissolved corporation. In absence of any persuasive authority, we decline Elementis's invitation to impose a cap on awards in successor liability cases.

In a related argument, Elementis contends Leren's claims are time-barred under the limitations period in RCW 23B.14.340 for a dissolved corporation or its shareholders. The court denied Elementis's motion for summary judgment

---

[48] Leren argued additional theories of successor liability. Due to our reasoning, there is no need to address those theories unsuccessfully advocated at trial.

[49] 99 Wn.2d 353, 662 P.2d 385 (1983).

[50] 93 Wn. App. 613, 969 P.2d 1090 (1999).

seeking to dismiss this suit as untimely. We review summary judgment orders de novo.[51]

The general rule at common law held that dissolved corporations ceased to exist and could not be sued, but the enactment of chapter 23B.14 RCW "showed the legislature's intent to cut any remaining ties" to that rule.[52] RCW 23B.14.340 governs the survival of remedies against a dissolved corporation, its directors, its officers, or its shareholders. Dissolution does not strip a claimant of the ability to file a lawsuit.[53] For a dissolution with an effective date prior to June 7, 2006, claims are timely when filed within two years of the date of dissolution.[54]

Benson was dissolved in 1978, and Leren filed suit in 2015. But Elementis provides no authority for the proposition that the legislature intended to bar successor liability claims when it enacted the dissolution statute. Notably, Benson, the dissolved corporation, is not party to this lawsuit. Nor is Elementis a defendant in its capacity as successor to a former Benson shareholder. Rather, Elementis is a defendant because the Estate alleges it is liable as HCP's successor when HCP is in turn a successor to Benson. Therefore, RCW 23B.14.340 does not apply. The court did not err by denying Elementis's motion for summary judgment.

---

[51] Ballard Square Condo. Owners Ass'n v. Dynasty Const. Co., 158 Wn.2d 603, 608, 146 P.3d 914 (2006).

[52] Id. at 609, 611.

[53] RCW 23B.14.050(2)(e)-(f).

[54] Ballard Square, 158 Wn.2d at 616. For dissolutions effective after June 7, 2006, claims are timely when filed within three years of the effective date of dissolution. RCW 23B.14.340.

14

II. Wrongful Death and Survivor Actions

Elementis argues the court erred by denying its motion for judgment as a matter of law that the Estate lacked the statutory beneficiary required to maintain a wrongful death claim or receive an award of noneconomic damages under the survivor statute.

"We review judgments as a matter of law de novo."[55] A motion for judgment as a matter of law admits the truth of the evidence and reasonable inferences favoring the nonmoving party.[56] Statutory interpretation is also a matter of law reviewed de novo.[57]

In its damages instructions, the court told the jury to consider economic damages, such as medical costs, and noneconomic damages, such as "pain, suffering, anxiety, emotional distress, and loss of enjoyment of life experienced," when calculating the extent of Leren's injury.[58] The court also told the jury to "consider what Marvin Leren reasonably would have been expected to contribute to [stepdaughter] Jo Lefebvre in the way of love, care, companionship, and guidance."[59] The jury awarded the Estate, on Leren's behalf, $294,000 in

---

[55] Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 848, 348 P.3d 389 (2015).

[56] Tapio Inv. Co. I v. State ex rel. the Dep't of Transp., 196 Wn. App. 528, 538, 384 P.3d 600 (2016).

[57] In re Est. of Blessing, 174 Wn.2d 228, 231, 273 P.3d 975 (2012).

[58] CP at 1933.

[59] CP at 1934.

economic damages and $681,000 in noneconomic damages.[60] The jury awarded Lefebvre "$0."[61]

At issue here is the interplay between the general survival statute, RCW 4.20.046, and the wrongful death statute, RCW 4.20.020. The survival statute allows "[a]ll causes of action by a person" to "survive to the personal representatives of the [person] . . . whether such actions arise on contract or otherwise."[62] But the survival statute has an exception "[t]hat the personal representative shall only be entitled to recover damages for pain and suffering . . . personal to and suffered by a deceased on behalf of those beneficiaries enumerated in RCW 4.20.020."[63] That statute allows wrongful death actions only "for the benefit of the wife, husband, state registered domestic partner, child or children, including stepchildren, of the person whose death shall have been so caused."[64]

Elementis argues the Estate was not entitled to noneconomic damages under the survival statute because Lefebvre is not a statutory stepchild. Any legal relationship between Lefebvre and Leren was severed, Elementis contends, when Leren and Lefebvre's mother divorced in 1985.

---

[60] CP at 916.

[61] Id.

[62] RCW 4.20.046(1).

[63] Id.

[64] RCW 4.20.020 (emphasis added).

16

A statutory stepchild under RCW 4.20.020 is "'a child of one's [spouse] by a former marriage.'"[65] The definition does not require "that stepchildren are necessarily the children of a _present_ spouse by a previous marriage or a former partner."[66] This is because "'the relationship by affinity is in fact . . . continued beyond the death of one of the parties to the marriage which created the relationship, and where the parties continue to maintain the same family ties and relationships, considering themselves morally bound to care for each other.'"[67] Relationships by "affinity" are formed by marriage rather than blood.[68]

The Estate relies on In re Estate of Blessing to argue Lefebvre is a statutory beneficiary.[69] In Blessing, our Supreme Court held that the death and remarriage of a nonbiological parent did not sever the bond between a stepparent and her stepchildren.[70] A woman married her first husband, and they had three children together.[71] After their divorce, she married her second husband, who had four children from a previous marriage.[72] They raised all seven children together,

---

[65] Blessing, 174 Wn.2d at 232 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 2237 (2002)).

[66] Id.

[67] Id. at 234 (quoting In re Estate of Bordeaux, 37 Wn.2d 561, 579-80, 225 P.2d 433 (1950)).

[68] Id. at 233 n.3.

[69] 174 Wn.2d 228, 273 P.3d 975 (2012).

[70] Id. at 235.

[71] Id. at 230.

[72] Id.

although she never adopted her second husband's children.[73] He died after almost 30 years of marriage.[74] The woman married for a third time, and her third husband died a few years later.[75] After the woman died in a car accident, her estate brought wrongful death claims on behalf of her three biological children and four stepchildren.[76] The court reasoned that the stepchildren "[i]ndisputably . . . at least during the marriage, had legal status as 'stepchildren.'"[77] And the "step relationship" continued even after they had become adults and the marriage terminated upon their father's death.[78] The court rejected the argument "that once a marriage ends, the step relationship ends," so the fact of the woman's remarriage was not germane.[79] Accordingly, the stepchildren "retained" their status under RCW 4.20.020.[80]

Similarly, here, Lefebvre indisputably became Leren's stepdaughter from age seven through to adulthood. Lefebvre's mother testified that people regarded Leren as Lefebvre's biological father.[81] As a child, Lefebvre did not have a relationship with her biological father, and she has always regarded Leren as her

---

[73] Id.

[74] Id.

[75] Id.

[76] Id.

[77] Id. at 231.

[78] Id. at 235.

[79] Id.

[80] Id.

[81] RP (Oct. 25, 2017) at 757.

18

father.[82] Leren taught Lefebvre how to tie her shoes, ride a bike, and catch a fish.[83]

Further, Lefebvre and Leren "'continue[d] to maintain the same family ties and relationships, considering themselves morally bound to care for each other'"[84] even after the divorce. Leren, Lefebvre, and her mother regularly celebrated Lefebvre's birthdays together.[85] For the five years Lefebvre lived overseas, she and Leren spoke by phone every week.[86] Leren and Lefebvre regularly went camping together until she married.[87] At Lefebvre's wedding, Leren walked her down the aisle and danced with her for the traditional father/daughter dance.[88] Leren attended funerals for Lefebvre's maternal grandmother and uncle.[89] Leren was present when Lefebvre's son was born, and Leren "was a strong figure" in her son's life.[90] After learning of his diagnosis, Lefebvre spent every night at the hospital with Leren until he died.[91] She informed her mother of his death.[92] Leren left a bequest for Lefebvre in his will, which he made in the weeks before his

---

[82] Id. at 757-59, 762.

[83] Id. at 814.

[84] Blessing, 174 Wn.2d at 234 (quoting Bordeaux, 37 Wn.2d at 579-80).

[85] RP (Oct. 25, 2017) at 773.

[86] Id. at 835.

[87] Id. at 772-73.

[88] Id. at 774.

[89] Id.

[90] Id. at 822.

[91] Id. at 803.

[92] Id. at 776.

death.[93] Although Elementis distinguishes Blessing because that marriage terminated by death rather than divorce, the bonds of affinity between Leren and Lefebvre indisputably lasted until the end of Leren's life. The logic of Blessing controls here and requires a similar result.

Elementis warns that absurd results will flow from ruling in the Estate's favor. Specifically, Elementis fears that former spouses will be able to maintain wrongful death claims. But spouses are not stepchildren. The bonds of affinity formed by marriage have ceased to exist between spouses who choose to divorce—hence, the divorce. Divorces do not, in theory, sever the bonds of affinity between a stepparent and a stepchild any more than between a parent and a biological child. "Any concerns over the result or regarding which stepchildren should be entitled to recover in a wrongful death suit are far more appropriately factored into any damages determination."[94] Lefebvre was a statutory beneficiary under RCW 4.20.020, and the Estate was properly allowed to collect noneconomic damages under RCW 4.20.046. The court did not err by denying Elementis's motion for judgment as a matter of law.[95]

---

[93] Id. at 835-36.

[94] Blessing, 174 Wn.2d at 238.

[95] We note that the legislature recently enacted amendments to the wrongful death and survival statutes. LAWS OF 2019, ch. 159, §§ 1-4. Significantly, the amendments remove the requirement that a decedent's second tier beneficiaries, which include siblings, must have been dependent on the decedent to be a statutory beneficiary for a wrongful death action or for receipt of noneconomic damages in a survivor action. Id. at §§ 2-3. These amendments apply retroactively to any case pending in any court as of the law's effective date. Id. at § 6. This could provide an alternative legal theory that retroactively supports

III. Superseding Cause of Injury

Elementis argues the court erred by denying its request for a jury instruction that Z-Brick's conduct was a superseding cause of Leren's injuries.[96]

We review jury instructions de novo for legal errors.[97] But the decision to provide a jury instruction depends on the facts of the case and is reviewed for abuse of discretion.[98] A court abuses its discretion where its ruling is based on untenable grounds.[99] Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theories of the case, and, read together, properly inform the jury of the applicable law.[100]

As a general matter, the superseding cause theory applies to product liability actions.[101] If an employer's conduct is at issue, failure to protect an employee from a product that is unreasonably unsafe can be a superseding cause

---

an award of noneconomic damages regardless of Lefebvre's status as a statutory beneficiary because Leren's brother is the Estate's personal representative.

[96] Although the court granted a partial motion for summary judgment on this issue in the Estate's favor, Elementis does not appeal that order and instead argues the court should have modified its order during trial and allowed the instruction.

[97] Paetsch, 182 Wn.2d at 849.

[98] Fergen v. Sestero, 182 Wn.2d 794, 802-03, 346 P.3d 708 (2015).

[99] Hizey v. Carpenter, 119 Wn.2d 251, 268, 830 P.2d 646 (1992).

[100] Fergen, 182 Wn.2d at 803.

[101] Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767-68, 389 P.3d 517 (2017).

where "the employer had <u>actual, specific knowledge</u> that the product was unreasonably unsafe and failed to warn or protect."[102]

An industrial hygienist testified that it was widely known by 1964 that direct and indirect asbestos exposure could cause mesothelioma and that major studies were published as early as 1949 linking asbestos exposure to lung cancer.[103] Additional testimony stated that all asbestos would have come with a warning printed on it beginning in 1972.[104] But no one testified about Z-Brick's actual, specific knowledge during the years Leren worked with asbestos. Elementis relies heavily on testimony from a former employee that beginning around 1963, workers would say, "Put on your mask. I'm going to add the asbestos now," before pouring it into a hopper.[105] This, according to Elementis, "shows an awareness of a hazard."[106] But that same employee explained the masks were just basic dust masks costing around 10 cents apiece.[107] Another Z-Brick employee testified the masks were for "nuisance dust" only.[108] Elementis's

---

[102] <u>Campbell v. ITE Imperial Corp.</u>, 107 Wn.2d 807, 817, 733 P.2d 969 (1987) (emphasis added). An employer's conduct also may constitute a superseding cause where "(1) the employer's intervening negligence created a different type of harm; or (2) the employer's intervening negligence operated independently of the danger created by the manufacturer." <u>Id.</u> Elementis does not argue either of these applies.

[103] RP (Oct. 23, 2017) at 437-38, 450.

[104] RP (Oct. 26, 2017) at 924-25.

[105] Appellant's Br. at 15, 37.

[106] <u>Id.</u> at 37.

[107] Ex. 328 at 16:00-16:30.

[108] RP (Oct. 25, 2017) at 769.

evidence merely proves some workers were generally aware of the hazards from dust. It is not the same as an employer's knowledge of risks from repeated exposure to asbestos dust. Given the lack of testimony about Z-Brick's actual, specific knowledge, the court did not abuse its discretion.

Therefore, we affirm.

WE CONCUR: