Streeter, Acting P.J., Dissenting.
At 11 years old, plaintiff Janine Hernandez suffered grievous injuries when the car in which she was riding, a 1992 Oldsmobile driven by her sister, was involved in a head-on collision. She survived, but as a paraplegic. She tried to sue various defendants based on a defective design theory, including General Motors Corporation (GM), the manufacturer of the 1992 Oldsmobile, but her lawsuit against GM was stayed when GM went bankrupt. This action is an attempt to hold Enterprise Rent-A-Car and its affiliates (Enterprise) liable as the corporate successor to the National Car Rental System Inc. (NCRS), the original lessor and seller of the car. I believe she is entitled to a trial. On both of the questions before us-strict liability, and corporate successor liability-I conclude that Enterprise failed to carry its burden as a summary judgment movant.
I. STRICT LIABILITY
If there was ever a textbook case in which the risk-spreading principles of strict liability under Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 ( Greenman ) and Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 ( Vandermark ) should apply, this is it. The trial court took the view that under Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 ( Price ), strict liability applies to car rental companies only during the period when they lease a car to the public, and that upon selling a car after retiring it as a rental, they get the protection of the rule that sellers of used goods are not subject to strict liability. ( Tauber-Arons Auctioneers Co. v. Superior Court (1980) 101 Cal.App.3d 268, 161 Cal.Rptr. 789 ( Tauber-Arons ); see also LaRosa v. Superior Court (1981) 122 Cal.App.3d 741, 176 Cal.Rptr. 224 ( LaRosa ); Wilkinson v. Hicks (1981) 126 Cal.App.3d 515, 179 Cal.Rptr. 5 ( Wilkinson ).) I believe this was error, and that we should say so.
*203 At issue in Price was a truck leased by Shell Oil Company (Shell) to an airplane service company, Flying Tiger Line, Inc. (Flying Tiger). ( Price , supra , 2 Cal.3d at p. 248, 85 Cal.Rptr. 178, 466 P.2d 722.) The plaintiff, a mechanic employed by Flying Tiger, was injured while using the leased truck. The Price court held that Shell could be held strictly liable, and that the form of the transaction by which the truck reached Flying Tiger-lease, rather than sale-was of no moment. What mattered, *480 the court held, was not the transactional form of distribution, but rather that Shell was "in the business of leasing" trucks on a "mass" scale, as distinguished from having engaged in a one-off, "isolated or occasional transaction." ( Id. at pp. 254-255, 85 Cal.Rptr. 178, 466 P.2d 722.) The trial court thought applying Price would require it to "extend" this holding, but I think that misreads the case. Nothing in Price suggests that it applies only during the term of a leased vehicle. In fact, that idea is contrary to the emphasis the Price court placed on looking past the form of the transaction by which a product is offered to the public. ( Id. at pp. 249-255, 85 Cal.Rptr. 178, 466 P.2d 722.)
Price represented a key step in the gradual expansion of the stream of commerce theory of strict liability first enunciated in Greenman and Vandermark. The basis of that theory, of course-a common law innovation that has had reverberations nationwide-is that the risk of injury caused by consumer goods should be allocated to those who are best positioned to take action to minimize the risk of future injury. By passing goods along the chain of distribution that ultimately reaches the consumer, any business within the chain is deemed to be "an integral part of the overall producing and marketing enterprise" and may be held accountable for "the cost of injuries resulting from defective products[.]" ( Vandermark , supra , 61 Cal.2d at p. 262, 37 Cal.Rptr. 896, 391 P.2d 168.) Recognizing the reality that vehicle leasing often goes hand-in-hand with vehicle sales in a marketing enterprise, Price relied on a vehicle leasing case from New Jersey, Cintrone v. Hertz Truck Leasing Etc. (1965) 45 N.J. 434, 440, [212 A.2d 769] ( Cintrone ). The defendant in Cintrone , "Hertz Truck Leasing & Rental Service[,] [was] in the business of leasing and renting various types of motor vehicles to the public." ( 212 A.2d at p. 772.) Hertz, as a lessor, was held to be strictly liable in tort to the employee of a customer who rented one of its trucks. ( Id. at pp. 771, 778-779.)
The Price court anchored its holding in the "broad philosophy" of strict liability, animated by the overall "purpose of ... 'insur[ing] that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' " ( Price , supra , 2 Cal.3d at p. 251, 85 Cal.Rptr. 178, 466 P.2d 722.) "[T]he paramount policy to be promoted" by the rule of strict liability, the court explained, "is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." ( Ibid. )
*204 With that as the doctrinal backdrop, the Price court discussed Cintrone at length, observing that a large scale vehicle leasing business puts " 'vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer,' subjects such a leased vehicle 'to more sustained use on the highways than most ordinary car purchasers,' and by the very nature of [its] business, exposes 'the bailee, his employees, passengers and the traveling public to a greater quantum of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer.' " ( Price , supra , 2 Cal.3d at p. 252, 85 Cal.Rptr. 178, 466 P.2d 722.) "In today's society," the court concluded, "with 'the growth of the business of renting motor vehicles, trucks and pleasure cars' ... and the persistent advertising efforts to put one 'in the driver's seat' ... we have no difficulty in finding the doctrine [of strict liability] peculiarly applicable to the lessor of motor vehicles." ( Id. at p. 253, 85 Cal.Rptr. 178, 466 P.2d 722.)
*481 Applying Price to this case, the fact that the specific transaction at issue here was a sale-at the end of the 1992 Oldsmobile's one-year tour of duty as a rental car in February 1993-is of no consequence. Central to the holding in Price is that the difference between leasing and selling does not matter. When analyzing the stream of commerce under Greenman and Vandermark , either mode of doing business may lead to strict liability since they are both means for introducing products into the marketplace. What is key is not the form of distribution, but whether a lessor may be said to have had a "participatory connection, for [its own] profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product." ( Kasel v. Remington Arms Co. (1972) 24 Cal.App.3d 711, 725, 101 Cal.Rptr. 314.)
In my view, there is such a "participatory connection" here. The key insight Price draws from Cintrone is that the motor vehicle leasing business and the motor vehicle manufacturing business, in modern commerce, are financially interdependent. Car rental companies promote car manufacturers' cars to the driving public-allowing rental customers, in effect, to test drive the cars for extended periods-and, in return, rental car companies benefit from the brand value of manufacturers in attracting potential rental customers. That is enough to put Enterprise in the stream of commerce between GM and the plaintiff in this case. No de facto distributorship or sales agency is required. Nor is de facto manufacturing status required.
Thus, I think the trial court was incorrect to conclude that, to apply strict liability here, it would have to "extend" Price. Our Supreme Court has already resolved the issue presented here-in Price itself, by embracing Cintrone. This case is controlled by Price as a matter of law, and even if there were some arguable factual question about whether Price applies because we do not know what, exactly, Old NCRS's *205 relationship with GM was, I think that on this record, the business reality is plain enough. After all, before Old NCRS's later incarnation as New NCRS in its mid-1990s corporate history, GM saw the National Car Rental business which both Old NCRS and New NCRS operated as sufficiently integral to its manufacturing and marketing enterprise to own it as a subsidiary. As evidence of the business realities in this case, Old NCRS's status as a GM operating subsidiary speaks volumes.
The only extension of doctrine in play here is the legal position Enterprise argues in reliance on Tauber-Arons , LaRosa , and Wilkinson. According to Enterprise, the sale of the 1992 Oldsmobile in 1993 triggers the rule under these cases that the seller of used machinery is not strictly liable in tort unless it rebuilds or reconditions the product and thus assumes a role analogous to that of a manufacturer. Whatever utility Tauber-Arons , LaRosa , and Wilkinson may have in promoting traditional modes of distribution for second-hand goods through flea markets, consignment sales and auction houses, I think it is unwise to apply those cases too broadly. They should be limited to situations in which the product in question passes to the consumer (whatever the form of the transaction) from some source outside of the marketing enterprise, as broadly defined in Kasel . ( Kasel , supra , 24 Cal.App.3d at p. 725, 101 Cal.Rptr. 314.)
In today's sharing economy, where many new forms of short-term rental relationships are proliferating in the consumer marketplace, and the Internet has disrupted quaint notions of tiered distribution from manufacturer to consumer, it is, in my view, unwise to read Price narrowly while giving an unduly broad reading to *482 Tauber-Arons and its progeny. The used goods cases reflect an economic reality about the consumer marketplace that is rapidly disappearing. Ultimately, the teaching of Greenman and Vandermark -some might say the genius of those Traynor-era cases-is that they instruct us as a common law court to adapt the law of torts to society's current economic realities.
II. CORPORATE SUCCESSOR LIABILITY
The primary ground of the trial court's grant of summary judgment, and the focus of almost all of its attention in its summary judgment order, was that the doctrine of strict liability does not apply. But at the end of its summary judgment order, the court briefly discussed and embraced Enterprise's backup argument that, on this summary judgment record, it has no liability as a corporate successor to NCRS. Without reaching strict liability, the majority affirms on this alternative ground. I respectfully disagree and would reverse on the issue of successor liability as well.
*206 My colleagues and I start from the same well-established premises. Under traditional principles of corporate successorship liability, the general rule is that a successor by asset purchase does not assume the selling corporation's debts and liabilities. ( Ray v. Alad Corp. (1977) 19 Cal.3d 22, 28, 136 Cal.Rptr. 574, 560 P.2d 3 ( Alad ).) But there are five exceptions to this general rule, and where we part ways is in whether any of those exceptions applies. I think at least two of them do, including one that is specifically designed for strict liability cases.
Successor liability attaches where "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." ( Alad , supra , 19 Cal.3d at p. 28, 136 Cal.Rptr. 574, 560 P.2d 3.) Our Supreme Court created a fifth, public-policy based exception known as the product line successor rule, tailored specifically to products liability cases. (See Kaminski v. Western MacArthur Co. (1985) 175 Cal.App.3d 445, 456, 220 Cal.Rptr. 895 ( Kaminski ) ["Given the policies underlying strict liability, the 'stream of commerce' approach to liability should extend to successor entities. When a distributor or retailer acquires a corporation and takes advantage of its goodwill and other corporate assets and facilities to inject the predecessor's product line into the stream of commerce, it continues 'the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.' "].)
The "[j]ustification for imposing strict liability upon a successor to a manufacturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." ( Alad , supra , 19 Cal.3d at p. 31, 136 Cal.Rptr. 574, 560 P.2d 3.)
At issue here are the first exception to the general rule of corporate successor nonliability (express assumption by agreement) and the fifth exception (product line liability under Alad ). "To establish that it [was] entitled to summary judgment," Enterprise *483 had the burden of showing that these two "exceptions ... do not apply in this case. Those issues are 'extremely fact sensitive.' " ( Fisher v. Allis-Chalmers Corp. Product Liability Trust (2002) 95 Cal.App.4th 1182, 1188, 116 Cal.Rptr.2d 310.) "Eliminating the exceptions require[d]" Enterprise to "disprov[e] at least one element of each exception or *207 show[ ] that at least one such element cannot be established." ( Ibid. ) Enterprise's summary judgment motion in this case sought to carry that burden by breaking the chain of successor liability at two points in the corporate history of NCRS.
First, Enterprise argued, plaintiff cannot trace the liability beyond 1996, when GM National Holding Co. (formerly Old NCRS) was merged into GM. Second, Enterprise argued, plaintiff cannot trace successor liability past the purchase by Cerberus Capital Management, L.P. (Cerberus) of the New NCRS assets out of bankruptcy in 2003. The trial court held that plaintiff could not clear either hurdle. Adopting Enterprise's reasoning, the court explained, "the string of liability would have been broken [in 2003] when NEW NCRS (assuming it [was] a successor to the liability of OLD NCRS, which itself is debatable) went into bankruptcy and its assets were purchased by CERBERUS MANAGEMENT pursuant to an 'Asset Purchase Agreement' in which Cerberus Management did not assume liabilities such as the strict liability for the automobile at issue in this case." Then, without discussion, the court briefly concluded if "OLD NCRS remained liable into the future, [its] liability would have been assumed by GM in OLD NCRS's merger with GM in 1996."
Both grounds for granting summary judgment on successor liability are erroneous, in my view.
A. Express Assumption
1. Contract Excerpts in the Summary Judgment Record
The summary judgment record addressing express assumption is not a model of clarity. In its statement of undisputed facts,[1] Enterprise supported its summary judgment motion with bits and pieces of the June 12, 2003 "Asset Purchase Agreement by and among ANC Rental Corporation, and the Other Debtors Listed on Signature Pages Hereof, debtors-in-possession, and Car Acquisition Company LLC and Cerberus Capital Management, L.P." Only a handful of pages from this contractual instrument are in the summary judgment record, but based on what can be seen from the few pages Enterprise provided, it is a lengthy, complex document. These excerpts-which include the caption page, some recitals, a signature page, and two of the document's many schedules-include only two pages of actual contract language. They span pages 26 and 27 of the contract and appear to include the entirety of section 2.3, which is entitled "Assumed Liabilities." In the *208 briefs, the parties argue back and forth about whether, under section 2.3(d), or under section 2.3(g), Enterprise expressly assumed the potential liabilities at issue in this case.
Under section 2.3(d), Enterprise assumed "[l]iabilities relating to or incurred in connection with the Acquired Assets ... that arise after the Closing Date." And under section 2.3(g), Enterprise assumed "[l]iabilities ... relating to accidents involving the vehicles of the Business and *484 the ALM Business[2] (i) reflected on or of a category reserved against on the March 31, 2003 consolidated balance sheet of Seller and outstanding on the Closing Date or (ii) incurred in the Ordinary Course of Business after March 31, 2003." Based on these contract fragments from the summary judgment record, the majority opinion takes Enterprise's side of this debate, concluding, in essence, that it is impossible that the potential liability involved in this case could have been expressly assumed, because, by 2003-a decade after NCRS sold the 1992 Oldsmobile to the S. family-the allegedly defective car at issue in this case could not have been an "Acquired Asset" within the meaning of section 2.3(d), and could not have been a "vehicle of the Business" under section 2.3(g). (Maj. opn., ante , at p. 477)
I do not think there is enough here to draw that conclusion. To begin with, and most basically, a corporate asset purchase of the kind we have here typically includes far more than simply the purchase of personalty. It may, and usually does, include the transfer of cash, real estate, goodwill, and intellectual property, including trademarks and other repositories of intangible brand value. There are many reasons this form of acquisition is used as a mode of acquisition, but one of the most common is that it allows a line of business comprising something less than an entire corporate entity to be transferred (which explains why its distinguishing feature is that of a sale of assets rather than a sale of stock). Why is this basic corporate mergers and acquisitions concept important here? Because the premise of the majority is that, if the specific car at issue in this case was no longer owned by NCRS as of 2003, liability for an accident caused by a car it sold many years before-having been out of its ownership and control for more than a decade-could not have been assumed by Enterprise.
Maybe that premise is right, or maybe it is wrong. But it is a problem of legacy tort liability that is well known in the business world, especially among businesses that operate over the course of many decades. Here, the question of express assumption depends on the meaning of the terms *209 "Acquired Assets" (§ 2.3(d)) and "Business" (§ 2.3(g)). If Cerberus's objective was to buy a line of business , including goodwill built up over many years and the "National Car Rental" brand value, then, depending on what exactly was negotiated in the bankruptcy proceedings, the purchase could easily have included liabilities relating to formerly owned assets. The scope of the purchase may have included all of the legacy liability, some of it, or none of it, but obviously the extent to which those liabilities were taken on board would have fundamentally affected the price and hence the amount of money received by the bankruptcy estate. All of which is to say that this kind of issue can be, and often is, a focal point of negotiation in bankruptcy, and as a result, it is not something we can safely make assumptions about when all we have in the summary judgment record is a few pieces of the Asset Purchase Agreement.
The majority opinion nevertheless reasons that section 2.3 "contains a list of specific liabilities that the purchasers agreed to assume from the seller entities" and that the 1992 Oldsmobile "was not an asset of New NCRS in 2003 and therefore not an 'Acquired Asset' of the purchasers *485 under the terms" of the Asset Purchase Agreement. (Maj. opn., ante , at p. 477.) The majority also concludes that "Cerberus never acquired any asset-neither the car nor the corporation-to which liability for [plaintiff's] future accident could have attached." (Maj. opn., ante , at p. 477.) I find these conclusions mystifying. We would never decide a contract interpretation issue in a breach of contract case-as a matter of law, especially in a case involving a complex contract-based on a record this scanty. Given the paucity of contractual materials in the summary judgment record here, I come to the opposite conclusion on each point. There is no list of specific assets in section 2.3, and there is no reference to formerly owned vehicles, one way or the other.
Because the most pertinent wording in section 2.3 is broad and general (e.g., "Acquired Assets," "Business"), and because those words are defined elsewhere in sections of the contract that were not made part of the summary judgment record, it is difficult to know the scope of the asset purchase based solely on the contractual language Enterprise selectively chose to present. If, as appears to be the case, this was a purchase of a line of business, and not a purchase of a discrete list of assets-say, a fleet of 5,245 specific automobiles with listed ownership registration numbers-then I would expect to see provisions elsewhere in the contract that shed light on whether the contracting parties addressed or contemplated the potential of legacy tort liability associated with that line of business. Strangely, however, the summary judgment record does not include enough of the Asset Purchase Agreement to discern whether the parties addressed that issue. At best for Enterprise, in my view, the pieces of the Asset Purchase Agreement cited in the statement of undisputed facts are ambiguous.
*210 Perhaps the record Enterprise relies upon would be sufficient under a summary judgment regime that only requires a movant to "point out" that a plaintiff cannot produce evidence raising a triable issue on some element of his or her claim. But of course under California rules of summary judgment procedure, more is required. A moving defendant bears "an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." ( Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 850, 107 Cal.Rptr.2d 841, 24 P.3d 493 ( Aguilar ); see id. at p. 854, 107 Cal.Rptr.2d 841, 24 P.3d 493 ["Summary judgment law in this state ... continues to require a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence."].) Under Aguilar , I would hold that Enterprise has failed to bear its initial burden of producing evidence negating any triable issue on successor liability, and reverse on that basis, without going further.
2. The More Complete Version of the Contract
Unmentioned by the majority is a more fulsome version of the Asset Purchase Agreement that is included as part of appellant's appendix. Though not specifically included in the statement of undisputed facts that makes up the summary judgment record, this version of the Asset Purchase Agreement was placed before the court in connection with two earlier attempts to obtain a case-dispositive ruling on successor liability, once by Enterprise, and once by a co-defendant, AutoNation, in support of unsuccessful demurrers decided by different trial judges than the judge who granted summary judgment. Notably, it is still not a fully complete copy of the Asset Purchase Agreement, since it fails to include numerous schedules and exhibits, *486 but it certainly sets forth the terms of ANC's asset sale to Cerberus in far greater detail than the bits and pieces of the contract cited by Enterprise in its statement of undisputed facts. This more complete version of the Asset Purchase Agreement fortifies my view that, at best for Enterprise, the governing contractual language is ambiguous with respect to whether there was an express assumption of the class of potential tort liability at issue in this case.
First, textually-when the fuller context of the defined terms is taken into account-I think a reading of the Asset Purchase Agreement favoring plaintiff's view that there was an express assumption is not only plausible, but is the more reasonable reading of it. The defined term "Acquired Assets" confirms that this was a sale of a line of business. As defined, the term means that Cerberus would "purchase, acquire and accept ... all of [Debtors'] business, properties, assets, goodwill, contracts, rights and claims of whatever kind or nature, real or personal, tangible or intangible, whether known or unknown, actual or contingent, wherever located, other than the Excluded *211 Assets." The defined term "Business" confirms that as well. As defined, "Business" means "car rental businesses in the airport and off-airport leisure and business travel rental markets" operated in various parts of the world "under the brand names Alamo, National and Guy Salmon[.]" Thus, what was acquired here was a collection of lines of car rental businesses, including one operated under the brand name "National."[3]
Second, based on the structure of the Asset Purchase Agreement, it is clear the parties recognized there was a wide range of legacy liabilities associated with the "Acquired Assets" and the past conduct of the "Business," presenting contingent risk going forward, after the closing date of the sale. These contingent risks are all dealt with in the same general way: Cerberus, having been given a full opportunity to conduct a due diligence investigation of the businesses being acquired,[4] accepted representations and warranties from the sellers that (1) other than existing claims against them-which were fully disclosed and reflected in current liabilities on the sellers' balance sheets-they knew of no potential or contingent liabilities that could have a material adverse effect on the value of the businesses being acquired,[5] and (2) the sellers had in place, and were transferring to Cerberus, insurance and accounting reserves adequate to deal with unknown, contingent liability.[6]
This is a standard way of dealing with contingent liabilities in a corporate acquisition, but it was not Cerberus's only protection. For any categories of risk Cerberus was particularly concerned about, it was able to, and it did, put such exposures on a *487 list of "Excluded Liabilities."[7] Included on this list, for example, were certain kinds of employment claims, contractual commitments under contracts that were not being transferred, tax liabilities beyond those reflected in the audited financial statements being relied upon at the time of closing, and liens on Acquired Assets other than the ones specifically disclosed and permitted. Contingent environmental liabilities, the only form of strict liability specifically identified in the Asset Purchase Agreement-which is, of course, imposed by statute as a matter of public policy-is not on the list of *212 "Excluded Liabilities." Legacy risk for strict liability claims arising from past operation of the acquired "Business" is not on the list of Excluded Liabilities either.
Reading the Asset Purchase Agreement as a whole, I conclude it is at least a reasonable construction, possibly a compelled construction as a matter of law, that there was an express assumption of the class of tort liabilities we are dealing with here. Nothing in the trial court's summary judgment order indicates that it considered the actual wording of the Asset Purchase Agreement. Based on some fragments of the contract language, the majority affirms, accepting Enterprise's argument that, since NCRS sold the 1992 Oldsmobile at issue here a decade before the asset sale to Cerberus in bankruptcy-thus showing that the car was not a "vehicle of the business" at the time of the asset purchase-it was impossible for any liability on plaintiff's yet-to-be-asserted claim to be expressly assumed. (Maj. opn., ante , at pp. 476-77.) This reading of the Asset Purchase Agreement is flawed.[8] It rests on a mistaken understanding of how contingent liability is handled in corporate acquisitions, and how it was handled here, as the Asset Purchase Agreement, when read in its entirety, plainly shows.
Without delving into the difficult questions of contract interpretation that Enterprise's proffered construction of the Asset Purchase Agreement presents, my colleagues never address whether the contract language is "reasonably susceptible" to an alternate reading favoring plaintiff. (See Morey v. Vannucci (1998) 64 Cal.App.4th 904, 912-913, 75 Cal.Rptr.2d 573.) I cannot join in their analysis. Summary judgment should have been denied because Enterprise presented selective excerpts of the Asset Purchase Agreement which are themselves ambiguous, thus raising a triable issue whether the contract should be construed to include an express assumption of the liability at issue. And upon consideration of what appears to be a nearly complete version of the Asset Purchase Agreement that is in the appellate record (though it was never tendered in support of the statement of undisputed facts), I am even more convinced that plaintiff is entitled to try the issue of express assumption.
*488 *213 B. The "Virtual Destruction" Element of Ray v. Alad
The trial court did not explain why its finding that Old NCRS's liability was assumed by GM in 1996 entitled Enterprise to summary judgment, but in so concluding it implicitly embraced two arguments Enterprise made in support of summary judgment, and continues to make here on appeal. First, Enterprise argued, and still argues, that there was no "virtual destruction" of plaintiff's remedies because GM-not New NCRS-was the sole corporate successor to Old NCRS by merger, and as a result, plaintiff retained the ability to seek recourse against GM. ( Petrini v. Mohasco Corp. (1998) 61 Cal.App.4th 1091, 1096, 1098, 71 Cal.Rptr.2d 910 ( Petrini ) [corporate successor following statutory merger assumes liability of predecessor by operation of law].) Second, and in the alternative, Enterprise argued, and still argues, even if GM was not the sole successor to Old NCRS, any successor liability New NCRS carried forward was cut off in its 2003 bankruptcy. ( Stewart v. Telex Communications, Inc. (1991) 1 Cal.App.4th 190, 200, 1 Cal.Rptr.2d 669 ( Stewart )). The majority erroneously accepts both of these arguments.
1. GM as the Purported Sole Successor to Old NCRS
The first step in Enterprise's "virtual destruction" line of argument is unsustainable. It skips over the fact that, on June 1, 1995-more than a year before the merger of Old NCRS (as renamed GM National Holding Co.) into GM-Old NCRS sold substantially all of its assets to NCR Acquisition Corporation (as renamed National Car Rental System Inc.).[9] The majority acknowledges this, but suggests that "NCRS continued to exist as a legal entity under a different name" until it merged with GM. (Maj. opn., ante , at p. 472.) But there is nothing in the record showing that after the 1995 asset sale, the predecessor corporation, GM National Holding Co., continued to operate , as was the case in Phillips v. Cooper Laboratories (1989) 215 Cal.App.3d 1648, 264 Cal.Rptr. 311, where the predecessor corporation, E.S. Miller Laboratories, Inc. continued to operate profitably in changed form for a decade after the asset sale in question. ( Id. at pp. 1652-1653, 264 Cal.Rptr. 311.) A holding company, in corporate parlance, is not an operating company.
After the June 1995 asset sale, GM National Holding Co. was left with net liabilities of $293.9 million. There is no evidence whatsoever that it was a *214 going concern at this point, in the sense of having adequate resources to cover its debts as they came due. The entity was nothing more than a paper company until GM absorbed it by merger, a step which had previously been ordered by the GM board two months before the asset sale.[10] It is a fair inference *489 from the timing-first the asset sale, followed shortly thereafter by the merger-that these two steps were part of the same transaction. To this extent, I agree that the proper analysis here is governed by a "straight-forward application" of Alad (maj. opn., ante , at p. 473), a case where substantially all of the assets of a predecessor (there Alad I) were sold to a successor (there Alad II), followed immediately by liquidation of the predecessor, thus destroying a product liability plaintiff's ability to sue the predecessor. ( Alad , supra , 19 Cal.3d at pp. 26, 33, 136 Cal.Rptr. 574, 560 P.2d 3.)[11]
Instead of taking on the 1995 asset sale and grappling with its implications, Enterprise elides the issue by shifting the focus ahead to the GM merger in 1996. Pointing to this second intra-corporate step in the transaction, Enterprise announces that GM, not New NCRS, is the true successor to Old NCRS and accuses plaintiff of adopting "the absurd position" that there were two successors to Old NCRS, GM and New NCRS. Enterprise insists that that cannot be the case. Alad , it contends, "did not hold that more than one entity can be held liable as a successor"; rather, "successor liability may apply where, as a result of the acquisition , there is no recourse against the original manufacturer at the time of the acquisition." In this case, we are told, "NCRS'[s] acquisition of Old NCRS'[s] assets did not prevent plaintiff from seeking recourse against old NCRS or GM, neither of which were liquidated as part of the sale of old NCRS."
Aside from being contrary to the record-Old NCRS was liquidated "as part of" the 1995 asset sale to New NCRS, since the 1996 absorption of Old NCRS into GM was ordered by GM's board shortly before the asset sale took place-this argument is legally wrong. First, and most fundamentally, it misconceives the nature of corporate successorship. The rules of successor *215 liability are not designed to pinpoint what entity has the status of the one and only true successor. The purpose of these rules, instead, is to identify circumstances in which a corporate entity has a sufficient relation to a predecessor entity to trigger an exception to the general rule of corporate successor nonliability, thus allowing us to say that the successor will be held derivatively liable for its predecessor's debts. Where a corporation, by asset sale, transfers all its assets and goodwill to Corporation No. 1, and then its empty shell, by statutory merger, disappears into Corporation No. 2, both Corporation No. 1 and Corporation No. 2 may be said to have a such a relationship to the predecessor-albeit by different routes. That is what we have in this case. Plaintiff simply has two different theories of derivative liability (liability under Alad vis-a-vis New NCRS, liability under statutory merger principles vis-a-vis GM) that may reach more than one entity in the chain of distribution.
Second, the argument rests on the flawed premise that so long as GM could *490 be held to account for what was left of Old NCRS's liabilities after the dissolution of Old NCRS (upon its merger into GM), there was no "virtual destruction of ... remedies" ( Alad , supra , 19 Cal.3d at p. 31, 136 Cal.Rptr. 574, 560 P.2d 3 ), and thus there were no liabilities for New NCRS (and hence, ultimately, Cerberus) to inherit. This line of argument was made in Kaminski , where the Western Asbestos Company (Western Asbestos), the original distributor of the asbestos insulation product to which Jack Kaminski was exposed, sold all of its assets to Western MacArthur Company (Western MacArthur). Two years after the asset sale, Western MacArthur dissolved Western Asbestos. (Kaminski , supra , 175 Cal.App.3d at pp. 450-453, 220 Cal.Rptr. 895.) On appeal from a judgment holding Western MacArthur liable for personal injury to Mr. Kaminski traceable to Western Asbestos's distribution of asbestos long before acquiring its assets, Western MacArthur, relying on the "complete denial of redress" prong of the Alad test ( Alad , supra , 19 Cal.3d at p. 32, 136 Cal.Rptr. 574, 560 P.2d 3 ), attempted to argue that successor liability under Alad "is only appropriate where the injured plaintiff has no other remedy or recovery against any other defendant." ( Kaminski , supra , 175 Cal.App.3d at p. 459, 220 Cal.Rptr. 895.)
The Kaminski court rejected the argument. "Products liability defendants in the chain of commerce suffer joint and several liability," the court explained. ( Kaminski , supra , 175 Cal.App.3d at p. 459, 220 Cal.Rptr. 895.) Because "[t]he presence of another legitimate target defendant in the case does not defeat successor liability against another legitimate defendant," the court construed the phrase "complete denial of redress" in Alad to mean "the complete denial of redress against a major defendant in the chain of commerce , be it manufacturer or distributor." ( Ibid. , italics added.) Here, the merger of Old NCRS (as renamed GM National Holding Co.) into GM in 1996 eliminated "a major defendant in the chain of commerce," namely Old NCRS, the rental company that launched the 1992 Oldsmobile into the stream of commerce. It makes no *216 difference that GM remained on the hook for whatever remained of Old NCRS's liabilities after the 1995 asset sale to New NCRS. To adopt the language used in Kaminski , the problem with the majority's reliance on Petrini , supra , 61 Cal.App.4th 1091, 71 Cal.Rptr.2d 910 is that the merger of Old NCRS into GM "effectively remove[d] the predecessor from the plaintiff['s] pool of recovery." ( Kaminski , supra , 175 Cal.App.3d at p. 456, 220 Cal.Rptr. 895.)
Greenman and its progeny authorize consumers injured by defective products to sue any target of their choice within the marketing chain of distribution, from the manufacturer on down the line. Because its predecessor Old NCRS was a cog in GM's marketing machine when the 1992 Oldsmobile involved in this case initially entered the flow of commerce, Enterprise cannot escape liability under these cases by arguing that, following the 1996 merger, plaintiff remained free to sue GM in its place. That argument, in my view, stands the rule of Greenman on its head. Recourse against the manufacturer is always an available remedy for a plaintiff in a product liability case, but Greenman recognizes it may not be a sufficient one. Indeed, as I see things here, the practical difficulty plaintiff encountered when she attempted to pursue GM-whose bankruptcy arguably serves as the most famous example in United States business history that no company is too big to fail-nicely illustrates the wisdom of the risk spreading rationale on which Greenman is founded.
2. Stewart v. Telex Communications, Inc.
On the facts presented here, plaintiff pursued recovery against multiple targets *491 within the chain of distribution, as was her right. She sued GM, but was stymied when GM went bankrupt. She also sued Enterprise in an effort to trace the current ownership of the National Car Rental brand and assert successor liability against New NCRS. The dispositive issue, then, has nothing to do with the Old NCRS-GM merger and the GM bankruptcy, but rather is whether successor liability may be traced forward from New NCRS to Enterprise by asset sale out of the ANC bankruptcy. Enterprise apparently recognizes this, because at the end of its argument it lays heavy emphasis on Stewart , supra , 1 Cal.App.4th 190, 1 Cal.Rptr.2d 669, arguing that "the purchaser of assets out of a bankruptcy is not liable for claims against the bankrupt entity."
Stewart was a product liability case involving an accident caused by a defective antenna manufactured by a company called Hy-Gain Electronics Corp. (Hy-Gain). ( Id. at p. 193, 1 Cal.Rptr.2d 669.) By the time of the accident, Hy-Gain had filed a voluntary petition of bankruptcy, and in the bankruptcy proceedings Telex Communications, Inc. (Telex) bought all of its assets and goodwill and continued manufacturing antennas using its blueprints and trademark. ( Id. at p. 194, 1 Cal.Rptr.2d 669.) Declining to apply Alad , the Stewart *217 court held that Telex could not be held liable on a corporate successor theory because it was the voluntary bankruptcy of Hy-Gain, not the asset sale to Telex, that caused the destruction of the plaintiff's remedies against Hy-Gain. ( Id. at pp. 195-200, 1 Cal.Rptr.2d 669.)
The majority suggests that the principle announced in Stewart has been "applied in both state and federal cases as a matter of California law[.]" (Maj. opn., ante , at p. 478.) To the extent this implies Stewart is part of a well-established vein of precedent not only in California but elsewhere, that is simply not the case. For the most part, we are talking about a few scattered federal district court decisions, plus Nelson v. Tiffany Industries, Inc. (9th Cir. 1985) 778 F.2d 533 ( Nelson ), a federal diversity case which simply reflects the Ninth Circuit's prediction in 1985 of how the California Supreme Court would apply Alad. Other than Stewart itself, that prediction has not borne much fruit. Over the course of nearly three decades, Stewart has been cited twice in published California appellate decisions, both times on background points of law and not once for its central holding on destruction of remedies in the context of a Chapter 11 bankruptcy.[12]
I respectfully disagree that Stewart and other cases in this rather thin body of precedent "turn on whether the successor corporation caused the financial difficulties that led the predecessor to be unavailable to cover liabilities to future tort victims." (Maj. opn., ante , at p. 478, italics added.) As I read these cases, they hold more narrowly that, absent evidence that a purchaser of assets in bankruptcy colluded with the bankrupt entity by inducing it to file for Chapter 11 protection, such a purchaser cannot be said to have "caused" the destruction of future tort claimants' remedies. ( Nelson , supra , 778 F.2d at p. 538 ; see Stewart , supra , 1 Cal.App.4th at p. 200, fn. 5, 1 Cal.Rptr.2d 669.) The logic is that, since Chapter 11 bankruptcy is designed to give the bankrupt entity a fresh start free of "inchoate and unknown tort liability" ( Stewart , supra , 1 Cal.App.4th at p. 200, 1 Cal.Rptr.2d 669 )-at least that is how the Stewart court understood what always happens in a voluntary bankruptcy-the *492 bankruptcy process is, in effect, an intervening cause, which breaks any chain of causation traceable to the buyer. (See ibid. [adopting the reasoning in Nelson that " 'it was Moody's bankruptcy and not Tiffany's subsequent purchase of the assets that destroyed Nelson's remedies' "].)
Stewart grounded its holding in bankruptcy policy, explaining that the discharge of indebtedness in bankruptcy "could be inhibited by a holding that assets of the bankrupt would be infected with the bankrupt's inchoate and unknown tort liability," since that kind of legacy exposure would tend to *218 drive down the price in any sale of the bankrupt's assets. ( Stewart , supra , 1 Cal.App.4th at p. 200, 1 Cal.Rptr.2d 669.)[13] In my view, Stewart does not resolve anything here. Even if it were the case that, in theory, successor liability of Cerberus and hence of Enterprise on unknown, yet-to-be-asserted claims could have been cut off in the bankruptcy process-more on that below-there is a triable issue on express assumption. Thus, before deciding the applicability and reach of Stewart on this record, it is important to understand that all the case does is bring us back to the question whether there was an express assumption by Cerberus of potential liability to plaintiff out of the ANC bankruptcy in 2003. Only if there was not, as a matter of law, must we address Stewart.
I do think it is worth pointing out, however, that Stewart should be read with caution. The notion that a Chapter 11 bankruptcy can insulate the bankrupt entity, and hence purchasers of its assets, against what the Stewart court calls "inchoate and unknown tort liability" ( Stewart , supra , 1 Cal.App.4th at p. 200, 1 Cal.Rptr.2d 669 ) has long been a controversial one. That issue turns on whether, prior to confirmation of the bankrupt's plan of reorganization, the bankruptcy trustee may, in effect, shed corporate successor liability by obtaining an order approving a sale of the bankrupt corporation's assets "free and clear of any interest in such property of an entity other than the estate" under 11 United States Code section 363(f) ( section 363(f) ). Most courts hold that successor liability claims may be considered "interest[s] in property" that may be extinguished under section 363(f).[14] But a growing body of law has developed recognizing an important caveat: For successor liability to be extinguished at the time of the bankruptcy there must be an existing claim against the debtor, or short *493 of that, some basis to identify a relationship *219 between a putative claimant's right to demand money and the debtor's use of the assets, or appropriate notice to potential claimants.[15]
3. Elliott v. GM LLC (In Matter of Motors Liquidation Co. )
Given the limited nature of a bankruptcy court's ability to extinguish future successor liability claims under section 363(f), I think plaintiff is correct to rely on the latest circuit-level case to address the issue, Elliott v. GM LLC (In Matter of Motors Liquidation Co. ) (2d Cir. 2016) 829 F.3d 135 ( Elliott ), for the proposition that an asset sale does not eliminate successor liability arising from unknown claims at the time of sale. The majority suggests this limitation on the reach of federal bankruptcy law is "a different question not relevant" to the state law principle of successor liability announced in Stewart (maj. opn., ante , at p. 478), but I do not agree that the two questions can be so easily separated. Even Enterprise argues that "[t]he federal bankruptcy law curtails the plaintiff's remedies, not the asset sale transaction." That is a fair reading of Stewart , which presupposes a voluntary Chapter 11 proceeding in which unknown claims are cut off. ( Stewart , supra , 1 Cal.App.4th at pp. 195-200, 1 Cal.Rptr.2d 669.) At the time Stewart was decided, bankruptcy law on this point was undeveloped. Not so anymore. Certainly after Elliott , we now know that liability on unknown claims may be cut off, protecting purchasers in a sale of business assets, only in certain narrowly defined circumstances.
Confirming a trend going back three decades in federal bankruptcy law, Elliott confined the scope of the "free and clear" order in that case to disclosed claims for which there was "(1) a right to payment (2) that arose before the filing of the petition" or resulted from " 'pre-petition conduct fairly giving rise to' " the claim in circumstances where there was "some contact or relationship between the debtor and the claimant such that the claimant is identifiable." ( Elliott , supra , 829 F.3d at p. 156.) Under that holding as applied here, to obtain an effective "free and clear" order, the onus was on the *220 debtor in the 2003 bankruptcy, ANC, to give notice to potential claimants, effectively charging it with the necessary knowledge to identify the potential for such claims. ( Id. at p. 160.) To the extent Stewart rests on a different understanding of how Chapter 11 bankruptcy works, I think more recent developments in bankruptcy law have cast the breadth of its reasoning into doubt.
Subject to section 363(f) of the Bankruptcy Code, a corporate asset sale in a *494 Chapter 11 proceeding should be treated like any other corporate asset sale for purposes of Alad. If the buyer of a product line in that setting succeeds to substantially all of its predecessor's assets and goodwill, it inherits whatever product liability exposure the acquired product line carried with it, unless a "free and clear" order narrows the scope of inherited liability. That is because, where the predecessor does not continue in the line of business it has sold-here, there is no question that after 2003 there was nothing left of ANC's National Car Rental business-the purchase of assets in a Chapter 11 bankruptcy does not, by itself, "cause" the destruction of remedies of future product liability claimants. Only a "free and clear" order can block such claims, and even where there is such an order, it will destroy remedies for purposes of Alad only to the extent Elliott permits extinguishment of inherited liability.
The bottom line is this. The issue presented here is not that we are called upon to apply a state law rule of successor liability (under Stewart ), rather than a federal bankruptcy rule (under Elliott ), but instead whether we should reconcile those two adjacent legal regimes. In my view, we should-by holding that the rule of Stewart applies only when the criteria in Elliott for enforcing a federal bankruptcy court's "free and clear" order cutting off yet-to-be-asserted claims have been satisfied. Unless we reconcile the tension between these two lines of authority in this way, who knows what unintended confusion we could be sowing in an area of law where predictability and certainty are as important as they are in bankruptcy.[16] Accordingly, because there is no proof in the summary judgment record bearing on what the scope of the "free and clear order" for the ANC-Cerberus asset sale was, or whether notice satisfying the rule in Elliott was given, I would conclude that Stewart does not apply, even assuming there were no triable issue on express assumption.
*221 * * * * * * *
This case presents two issues in the field of product liability law, the first involving an application of the stream of commerce doctrine of Greenman , supra , 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, and Vandermark , supra , 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168, and the second involving an application of the closely related corporate successorship doctrine of Alad , supra , 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3. Both are close questions that have arisen persistently over the years but that have not been definitively resolved. They both are deserving of the California Supreme Court's attention, if not in this case in some future case.

See United Community Church v. Garcin (1991) 231 Cal.App.3d 327, 337, 282 Cal.Rptr. 368 (the "Golden Rule" of summary judgment and summary adjudication is that " 'if it is not set forth in the separate statement, it does not exist ' ").

"ALM Business" was defined as "the car rental business previously operated by Spirit Rent-A-Car, Inc. and its predecessors in the car replacement market throughout the United States under one or more of the brand names 'Spirit', 'CarTemps USA' or 'Alamo Local'." (Asset Purchase Agreement § 1.1.)

One of the additional pieces of information that can be gleaned from the more complete version of the Asset Purchase Agreement is a list of companies-including NCRS-whose stock was not included in the definition of "Acquired Assets." (Asset Purchase Agreement schedule 2.2(a) [Equity Securities not Included in Acquired Assets].)

Asset Purchase Agreement sections 4.7 (Information), 5.2 (Access to Information; Cooperation; Confidentiality).

Asset Purchase Agreement sections 3.10(a) (Litigation), 3.13(e) (Employee Benefit Matters), 3.14(a) (Labor Relations and Employment), 3.15(f) (Environmental Matters), 3.16(b) (Intellectual Property).

Asset Purchase Agreement sections 3.26 (Insurance), 3.5(d) (contingent liabilities either disclosed or adequately reserved against), 6.2(a) (truth of all representations and warranties qualified by material adverse effect threshold).

Asset Purchase Agreement section 2.4 (Excluded Liabilities).

As just one example of how, textually, that interpretation is problematic, the Asset Purchase Agreement defines the term "Existing Vehicles" to have a literal meaning specific to autos currently owned, since it requires disclosure of detailed identifying information for each one. (Asset Purchase Agreement § 3.19 (Vehicles).) The phrase "vehicle of the Business" in section 2.3(g) does not use this defined term, which suggests it has a broader meaning. That broader meaning could mean Existing Vehicles and all vehicles acquired by the Business hereafter; it could mean Existing Vehicles and vehicles that have ever been owned by the Business; or it could have both prospective and retrospective meanings. In short, the phrase is reasonably susceptible of more than one meaning.

My colleagues and I, for clarity, refer to National Car Rental System Inc. at this stage in its corporate evolution as New NCRS. In the corporate history after 1996, there were two interim steps before Cerberus's purchase of New NCRS's assets in 2003. In 1997, Republic Industries, Inc. acquired New NCRS in a stock-for-stock exchange, operating it as part of a conglomerate of car sales and rental car businesses for three years. And in 2000, Republic Industries, Inc. spun off its rental car businesses to a company known as ANC Rental Corporation (ANC). It is ANC and its affiliates that filed for bankruptcy in 2003, selling the New NCRS assets to Cerberus at that point.

Certificate of Ownership and Merger Merging GM National Holding Co. Into General Motors Corporation (June 24, 1996), Third Recital (the GM board of directors, "by resolution duly adopted ... on the 3rd day of April 1995, determined to merge with and into itself GM National Holding Co."). Advance documentation of the mandatory wind-up of GM National Holding Co. was presumably required for GM to take a tax loss of $147 million in 1995 on the sale of Old NCRS's assets, which is what was reported in GM's fiscal year 1995 audited consolidated financial statements, as disclosed in GM's SEC Form 10-K that year.

The majority points out that plaintiff pleaded successorship liability under the "mere continuation" and express assumption exceptions, but abandoned any theory of successorship under the de facto merger exception. (Maj. opn., ante , at pp. 473-75.) I'm not sure why this is relevant. No one disputes that plaintiff adequately pleaded successor liability generally, which allows her to rely on product line successorship under Alad. And based on Alad , the record creates a triable issue of successorship liability from Old NCRS to New NCRS as a result of the 1995 asset sale, and that is enough.

See Pepperell v. Scottsdale Ins. Co. (1998) 62 Cal.App.4th 1045, 1054, 73 Cal.Rptr.2d 164 ; Wright v. Stang Manufacturing Co. (1997) 54 Cal.App.4th 1218, 1223, fn. 1, 63 Cal.Rptr.2d 422.

The assumption driving this policy rationale-that there is a preference in Chapter 11 bankruptcy for promoting the discharge of indebtedness by ridding the debtor of "inchoate and unknown tort liability" in order to maximize value in a sale of assets-is a matter of considerable controversy among bankruptcy specialists. (See Swett, "Free and Clear" Bankruptcy Sale Orders and State Law Successor Liability Claims: The Overlooked Question of Preemption (2017) 25 Am. Bankr. Inst. L.Rev. 275, 309 ["Maximizing the estate on the backs of tort victims is not an imperative that can be found in the [Bankruptcy] Code. And the idea that successor liability emanating from product-related tort claims should be extinguished for the sake of equality of distribution clashes in several different ways with usual premises of bankruptcy law."].)

In re Trans World Airlines, Inc. (3d Cir. 2003) 322 F.3d 283, 288-291 ; In re Leckie Smokeless Coal Co. (4th Cir. 1996) 99 F.3d 573, 581-582, 585-587 ; see In re Paris Industries Corp. (Bankr. D.Me. 1991) 132 B.R. 504, 507-510 ; In re All American of Ashburn, Inc. (Bankr. N.D.Ga. 1986) 56 B.R. 186, 189-190 ; Kuney, Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process (2002) 76 Am. Bankr. L.J. 235, 267 ("the dominant interpretation [of] ... § 363(f) [is that it] can be used to sell property free and clear of claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability").

See In re Savage Industries, Inc. (1st Cir. 1994) 43 F.3d 714, 720-722 (successor liability claim, even if it constituted an "interest" under § 363(f), could not be extinguished where no notice provided to claimant); Truck Drivers Union v. Tasemkin, Inc. (7th Cir. 1995) 59 F.3d 48, 50-51 (successor liability claim could proceed and was not cut off by prior bankruptcy proceeding); see generally In re Piper Aircraft Corp. (Bankr. S.D.Fla. 1994) 162 B.R. 619, 623-624, 627-629 (unknown future claimants lacked any prepetition relationship with debtor's conduct and thus had no claims in bankruptcy proceeding); In re Fairchild Aircraft Corp. (Bankr. W.D.Tex. 1995) 184 B.R. 910, 917-918, 923-924, 933, vacated on other grounds (Bankr. W.D.Tex. 1998) 220 B.R. 909 ; American Bankruptcy Institute, 22nd Annual Spring Meeting (2004) Concurrent Session: Successor Liability Revisited: Recent Developments and Trends , Cohen, Successor Liability in Section 363 Sales , 041504 ABI-CLE 487, text accompanying fn. 17 ("There appears to have developed a bright-line rule that the failure to provide an identifiable holder of a successor liability claim with adequate notice of the bankruptcy in which a sale purports to be free and clear of successor liability claims renders the sale subject to that successor liability claim. The lack of notice is a defect of constitutional dimensions.").

See Butner v. United States (1979) 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 ("Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum-shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' ").